UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

```
SOUTHERN DISTRICT OF MISSISSIPPI
          F I L E D

        AUG 07 2013

        J T NOBLIN CLERK
BY_____ DEPUTY
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE PAILY PAULOSE CHAKKIYATTIL;
CHANDRASEKHARA PILLAI RAJESH
CHEMMANAPPILLY; SUKUMAR MOSES DOKKA;
ROY PUNAKKATTU GEORGE; RADHAKRISHNAN
KAKKATHIRUTHI; JOHN ABRAHAM
KALAMPUKATT; THOMAS BABY
MADAKKAMEPRATHU; ANTHONY MARIAN;
JACOB MATHEW; SHAJU OLANGATTU MATHEW;
DAVIS MATHAI MELEDAN; JEEGAN JOSEPH
CHERUTHALAKAL MICHAEL; GOPALAKRISHNAN
UNNIAMPATHU VETTICAL NAIR; PRAKASH
KUTTIYIL CHANDRASEKHARAN NAIR; FRANCIS
KOTTACKAL OUSEPH; PURAYIL ARJUNAN
PADINHARE; SUDHEERAN PANAYAMTHATTA;
TELSON JOSEPH PAZHAMPILLY; SREEKUMAR
JANARDHANAN PILLAI; PRADEEP CHEMBIL
RAMAN; SHAWKAT ALI SHAIKH; ARUNKUMAR
SHAW NARAYAN SHAW; SUBASH CHANDRA
SHUKLA; AJITH CHELLAYYAN SWARNAMMA;
SHIBU THANKACHAN; JAISON ANTONY
THEKKUMPURAM; SHAJAN VARGHESE; AND
THOMAS VARGHESE VATTAKKATTU,

                    Plaintiffs,

         v.

SIGNAL INTERNATIONAL, LLC, SIGNAL
INTERNATIONAL, INC.; MALVERN C. BURNETT;
LAW OFFICES OF MALVERN C. BURNETT; GULF
COAST IMMIGRATION LAW CENTER, L.L.C.; J & M
ASSOCIATES, INC. OF MISSISSIPPI; BILLY R.
WILKS; J & M MARINE & INDUSTRIAL, LLC;
GLOBAL RESOURCES, INC.; SACHIN DEWAN;
DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH
CONSULTANTS),

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action
No.   1:13cv318 LG-JMR

**JURY TRIAL DEMANDED**


**COMPLAINT**

Plaintiffs George Paily Paulose Chakkiyattil, Chandrasekhara Pillai Rajesh Chemmanappilly, Sukumar Moses Dokka, Roy Punakkattu George, Radhakrishnan Kakkathiruthi, John Abraham Kalampukatt, Thomas Baby Madakkameprathu, Anthony Marian, Jacob Mathew, Shaju Olangattu Mathew, Davis Mathai Meledan, Jeegan Joseph Cheruthalakal Michael, Gopalakrishnan Unniampathu Vettical Nair, Prakash Kuttiyil Chandrasekharan Nair, Francis Kottackal Ouseph, Purayil Arjunan Padinhare, Sudheeran Panayamthatta, Telson Joseph Pazhampilly, Sreekumar Janardhanan Pillai, Pradeep Chembil Raman, Shawkat Ali Shaikh, Arunkumar Shaw Narayan Shaw, Subash Chandra Shukla, Ajith Chellayyan Swarnamma, Shibu Thankachan, Jaison Antony Thekkumpuram, Shajan Varghese and Thomas Varghese Vattakkattu, upon knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.     The plaintiffs are twenty-eight men from India.  They were promised employment, prosperity and permanent residence in the United States.  They each paid thousands of dollars in recruitment fees to take advantage of the promised opportunity, incurring substantial debt.  When they arrived in the United States, they were forced, under threat of removal to India and economic ruin, to perform arduous work in dangerous conditions and to pay exorbitant costs for substandard housing and food.

2.     The defendants are the people and entities involved in the recruiting and employment of the plaintiffs.  They induced and exploited the plaintiffs' financial situations, and they profited from the plaintiffs' labor and payments without ever intending to fulfill their promises to the plaintiffs.

3.     In this action, the plaintiffs seek, inter alia, compensation for the damages they suffered as victims of labor trafficking, discrimination, fraud, misrepresentation and breach of contract.

**PARTIES**

4.     All Plaintiffs are Indian nationals, of Indian race and ethnicity, and former H-2B guestworkers who were recruited from India by Defendants between 2003 and 2006 and worked at Signal International, LLC's facility in Pascagoula, Mississippi after arriving in the United States.  Plaintiffs each paid to agents of Signal International, LLC and J & M Associates, Inc. of Mississippi -- Malvern Burnett and his law firms, Michael Pol and his firm Global Resources, and Sachin Dewan and his firm Dewan Consultants -- between approximately $10,000 and $16,000 in "recruitment fees" based upon the false promise that Signal International, LLC and J & M Associates of Mississippi, Inc. and their agents would assist Plaintiffs in applying for and obtaining "green card" status as legal permanent residents of the United States.  Plaintiffs were each subjected to discriminatory, dangerous and abusive treatment at the Pascagoula facility by Signal International, LLC and its agents.

5.     Plaintiff George Paily Paulose Chakkiyattil was recruited beginning in or about February 2005 and arrived in the United States on or about December 27, 2006.

6.     Plaintiff Chandrasekhara Pillai Rajesh Chemmanappilly was recruited beginning in or about early 2005 and arrived in the United States in or about November 2006.

7.     Plaintiff Sukumar Moses Dokka was recruited beginning in or about April 2004 and arrived in the United States on or about December 18, 2006.

8.     Plaintiff Roy Punakkattu George was recruited beginning in or about February 2004 and arrived in the United States on or about November 28, 2006.

3

9.      Plaintiff Radhakrishnan Kakkathiruthi was recruited beginning in or about late 2003 and arrived in the United States on or about December 12, 2006.

10.     Plaintiff John Abraham Kalampukatt was recruited beginning in or about 2003 and arrived in the United States on or about November 24 or 26, 2006.

11.     Plaintiff Thomas Baby Madakkameprathu was recruited beginning in early 2004 and arrived in the United States in or about November 2006.

12.     Plaintiff Anthony Marian was recruited beginning in or about April 2004 and arrived in the United States on or about December 18, 2006.

13.     Plaintiff Jacob Mathew was recruited beginning in or about August 2004 and arrived in the United States on or about December 6, 2006.

14.     Plaintiff Shaju Olangattu Mathew was recruited beginning in or about February 2005 and arrived in the United States on or about December 7, 2006.

15.     Plaintiff Davis Mathai Meledan was recruited beginning in or about March 2004 and arrived in the United States on or about October 31, 2006.

16.     Plaintiff Jeegan Joseph Cheruthalakal Michael was recruited beginning in or about February 2004 and arrived in the United States in or about December 2006.

17.     Plaintiff Gopalakrishnan Unniampathu Vettical Nair was recruited beginning in late 2003 and arrived in the United States on or about October 31, 2006.

18.     Plaintiff Prakash Kuttiyil Chandrasekharan Nair was recruited beginning in or about December 2004 and arrived in the United States on or about December 6, 2006.

19.     Plaintiff Francis Kottackal Ouseph was recruited beginning in or around April 2004 and arrived in the United States on or about December 5, 2006.

4

20.     Plaintiff Purayil Arjunan Padinhare was recruited beginning in or about December 2004 and arrived in the United States in or about November 2006.

21.     Plaintiff Sudheeran Panayamthatta was recruited beginning in or about November 2005 and arrived in the United States on or about December 13, 2006.

22.     Plaintiff Telson Joseph Pazhampilly was recruited beginning in late 2003 or early 2004 and arrived in the United States on or about December 6, 2006.

23.     Plaintiff Sreekumar Janardhanan Pillai was recruited beginning in or about December 2003 and arrived in the United States in or about December 2006.

24.     Plaintiff Pradeep Chembil Raman was recruited beginning in or about March 2004 and arrived in the United States on or about December 18, 2006.

25.     Plaintiff Shawkat Ali Shaikh was recruited beginning in or about March 2004 and arrived in the United States on or about January 24, 2007.

26.     Plaintiff Arunkumar Shaw Narayan Shaw was recruited beginning in or about April 2004 and arrived in the United States on or about January 23, 2007.

27.     Plaintiff Subash Chandra Shukla was recruited beginning in or about March 2004 and arrived in the United States in or about November 2006.

28.     Plaintiff Ajith Chellayyan Swarnamma was recruited beginning in or about January or February 2004 and arrived in the United States on or about November 30, 2006.

29.     Plaintiff Shibu Thankachan in or about December 2004 and arrived in the United States on or about December 7, 2006.

30.     Plaintiff Jaison Antony Thekkumpuram was recruited beginning in or about February 2004 and arrived in the United States on or about December 7, 2006.

31.     Plaintiff Shajan Varghese was recruited beginning in or about December 2004 and arrived in the United States on or about December 7, 2006.

32.     Plaintiff Thomas Varghese Vattakkattu was recruited beginning in or around 2005 and arrived in the United States on or about November 28, 2006.

33.     Defendant Signal International, LLC is a company organized under the laws of Delaware, with facilities in the Gulf Coast region, including Pascagoula, Mississippi, where its principal office is located. Defendant Signal International, Inc. is a corporation organized under the laws of Delaware and is the parent corporation of Signal International, LLC. At all relevant times, Signal International, LLC acted as an agent and/or alter ego of Signal International, Inc. and took all conduct discussed herein with the knowledge and consent of Signal International, Inc. Signal International, LLC and Signal International, Inc. are referred herein collectively as "Signal." Signal provides marine and fabrication services including offshore drilling rig and ship overhaul, repair, upgrade and conversion.

34.     Defendant J & M Associates of Mississippi, Inc. is a now-dissolved corporation organized under the laws of Mississippi. J & M Associates of Mississippi, Inc. was at all relevant times engaged in the business of recruiting Indian laborers with promises of employment and immigration opportunities and providing those laborers to United States companies. Billy R. Wilks listed himself as the registered agent and his home address as the company's principal address with the Mississippi Secretary of State.

35.     Defendant J & M Marine & Industrial, LLC ("J & M Marine") is a now-dissolved limited liability company organized under the laws of Mississippi. It was engaged in the business of recruiting Indian laborers with promises of opportunities for employment and immigration and providing those laborers to United States companies.

6

36.    Defendant Billy R. Wilks ("Wilks") was a director or officer of J & M Associates of Mississippi, Inc. and J & M Marine. Wilks had full control and decision-making authority over J & M Associates of Mississippi, Inc. and J & M Marine such that J & M Associates of Mississippi, Inc., Wilks and J & M Marine are alter egos, and Wilks is personally liable for the conduct of J & M Associates of Mississippi, Inc. and J & M Marine. Wilks resides in Moss Point, Mississippi.

37.    On information and belief, J & M Marine is a corporation that Wilks created to continue the work that was underway with J & M Associates of Mississippi, Inc. while avoiding litigation pending against J & M Associates of Mississippi, Inc.. J & M Marine was a mere continuation of J & M Associates of Mississippi, Inc. with no substantial difference in management, personnel or corporate purpose. As the successor corporation to J & M Associates of Mississippi, Inc., J & M Marine is liable for any judgment entered against J & M Associates of Mississippi, Inc. J & M Associates of Mississippi, Inc., Wilks and J & M Marine are referred herein collectively as "J & M Associates."

38.    Defendant Global Resources, Inc. ("Global Resources") is a now-dissolved corporation organized under the laws of Mississippi that recruited workers from India for employment in the United States. At all relevant times, Michael Pol ("Pol"), a resident of Mississippi, was the president of Global Resources.

39.    Defendant Dewan Consultants Pvt. Ltd. (a/k/a/ Medtech Consultants) ("Dewan Consultants" and, collectively with Defendant Sachin Dewan, "Dewan") is a private limited liability company organized under the laws of India. Dewan Consultants has substantial business contacts with Pascagoula, Mississippi. In 2004, Dewan Consultants contracted with Global Resources and Defendant Malvern C. Burnett -- through Defendant Gulf Coast

7

Immigration Law Center, L.L.C. -- to identify and recruit Indian workers for employment in the United States.

40.     Defendant Sachin Dewan is the director of Dewan Consultants. Sachin Dewan resides in India and has, since at least 2005, had substantial business contacts with Pascagoula, Mississippi, including travel to Pascagoula on behalf of Signal and Dewan Consultants in connection with conduct complained of herein.

41.     Defendant Malvern C. Burnett is an attorney who maintains a law office in Ocean Springs, Mississippi. On information and belief, Malvern Burnett performed, in Mississippi, legal work necessary to bring Plaintiffs and other Indian workers to the United States on H-2B visas.

42.     Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana that maintains offices in Ocean Springs, Mississippi. Malvern Burnett lists himself as the registered agent and his home address as Burnett Law Offices's principal address.

43.     Defendant Gulf Coast Immigration Law Center, L.L.C. ("Gulf Coast Immigration") is a limited liability company organized under the laws of Louisiana that maintains offices in Mississippi. Malvern Burnett is the sole member and corporate officer of Gulf Coast Immigration and lists himself as the registered agent and his home address as Gulf Coast Immigration's principal address. Malvern C. Burnett, the Burnett Law Offices and Gulf Coast Immigration operated as a joint venture and/or alter egos and are referred herein collectively as "Burnett."

44.     At all relevant times, Burnett had an attorney-client relationship with each Plaintiff (and all Indian workers employed by Signal), for purposes of immigration issues and Plaintiffs' work for Signal.

45.     At all relevant times, Dewan, Global Resources and Burnett acted as agents of Signal and/or J & M Associates, and were acting within the course and scope of their agency, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of Signal and J & M Associates in performing the acts alleged in this complaint.

46.     At all relevant times, Dewan, Global Resources and Burnett were involved in a venture with each other to recruit the Indian workers, including Plaintiffs, and bring them to the United States to work at Signal and/or J & M Associates, and were acting within the course and scope of that venture and those agreements, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this complaint.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1595(a) (trafficking), 28 U.S.C. § 1343 (civil rights) and 28 U.S.C. § 1367 (pendant state law claims).

48.     Signal is subject to personal jurisdiction in Mississippi because Signal maintains a continuing business presence in Mississippi, including two shipyards in Pascagoula, Mississippi, where Plaintiffs worked.  Signal committed most of the wrongful conduct complained of herein in Mississippi.

49.     J & M Associates of Mississippi, Inc. is subject to personal jurisdiction in Mississippi because it was a corporation organized under the laws of Mississippi and because at

9

all relevant times it maintained a substantial business presence in Mississippi including its principal address. J & M Associates of Mississippi, Inc. committed most of the wrongful conduct complained of herein in Mississippi.

50.     Wilks is subject to personal jurisdiction in Mississippi because he resides in Mississippi. Wilks committed most of the wrongful conduct complained of herein in Mississippi.

51.     J & M Marine is subject to personal jurisdiction in Mississippi because it was a corporation organized under the laws of Mississippi and because at all relevant times it maintained a substantial business presence in Mississippi including its principal address. J & M Marine committed most of the wrongful conduct complained of herein in Mississippi.

52.     Sachin Dewan and Dewan Consultants are subject to personal jurisdiction in Mississippi because they contracted with Global Resources and Burnett and served as Signal's agents to deliver Plaintiffs for employment in Mississippi. Sachin Dewan traveled to Mississippi to further his business objectives, both individually and on behalf of Dewan Consultants, in connection with the conduct complained of herein.

53.     Malvern Burnett is subject to personal jurisdiction in Mississippi because he practices law in Mississippi. Malvern Burnett performed legal work for the purpose of facilitating Plaintiffs' employment in Mississippi and much of that legal work was performed in Mississippi.

54.     Burnett Law Offices is subject to personal jurisdiction in Mississippi because it maintains an office in Ocean Springs, Mississippi. Burnett Law Offices performed legal work for the purpose of facilitating Plaintiffs' employment in Mississippi and much of that legal work was performed in Mississippi.

55.     Gulf Coast Immigration is subject to personal jurisdiction in Mississippi because it maintains an office in Ocean Springs, Mississippi.  Gulf Coast Immigration performed legal work in Mississippi for the purpose of facilitating Plaintiffs' employment in Mississippi.

56.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants conducted a substantial part of their trafficking, civil rights violations, fraud, misrepresentations and contractual breaches within the Southern District of Mississippi.

## FACTUAL BACKGROUND

### *The Initial Recruitment Process*

57.     From 2003 through at least 2005, Dewan and Global Resources, in coordination with Burnett and J & M Associates, placed advertisements in newspapers in India, the United Arab Emirates and Kuwait seeking welders, fitters and other marine fabrication workers for J & M Associates.

58.     The advertisements announced job opportunities in the United States and promised that qualified candidates could obtain legal permanent residence (green cards) in the United States for themselves and their families.  One such advertisement listed Dewan Consultants as the contact and promised a "Job opportunity" and "Permanent lifetime settlement in USA for self and family."  Plaintiffs either saw these advertisements themselves or were told of the advertised opportunities by family or friends.

59.     In response to these advertisements, Plaintiffs contacted Dewan and Global Resources and attended meetings and testing sessions organized by Dewan, Global Resources, Burnett and J & M Associates at several locations throughout India and the United Arab Emirates.

11

60.     At these meetings and in telephone conversations, Dewan, Global Resources and Burnett told Plaintiffs that J & M Associates was a U.S. company offering employment opportunities in the United States.

61.     Dewan, Global Resources and Burnett told Plaintiffs that if they passed trade tests in India or the United Arab Emirates, and paid fees totaling 465,000 to 900,000 rupees (approximately $9,800 to $15,000), then J & M Associates would sponsor them in applications for green cards, enabling them to permanently and legally immigrate to the United States.

62.     Dewan, Global Resources, Burnett and J & M Associates told Plaintiffs that for approximately $1,500 more per family member, Plaintiffs could also obtain green cards for their spouses and children.

63.     Dewan, Global Resources and Burnett told Plaintiffs that the total fees would be paid in three installments.

64.     Dewan, Global Resources and Burnett assured Plaintiffs that they would receive green cards within two years of arriving in the United States.  They also promised to do everything necessary to obtain green cards for Plaintiffs within those two years.

65.     Dewan, Global Resources and Burnett did not intend to diligently pursue green card applications on Plaintiffs' behalf and each knew, or should have known, that they would not do so.

66.     Dewan, Global Resources and Burnett knowingly and falsely represented, or should have known, inter alia, that the green card applications would be valid and bona fide under U.S. immigration law and that the applications were likely to be completed and approved within the promised time.

67.     Dewan, Global Resources and Burnett represented to Plaintiffs that no additional fees would be required for the legal services necessary to obtain the green cards.

68.     Based on these and other contractually binding promises made to them concerning opportunities for employment and green cards in the United States, Plaintiffs signed contracts with Dewan, Global Resources and Burnett.

69.     In reasonable reliance on explicit and repeated promises by Dewan, Global Resources and Burnett regarding lawful and legitimate employment opportunities and permanent immigration opportunities for Plaintiffs and their families in the United States, Plaintiffs undertook considerable economic, social, familial and personal sacrifices, including payment of high fees, assumption of significant interest-bearing debt, loss of real and personal property and lost work opportunities.

70.     Dewan, Global Resources and Burnett knew Plaintiffs would rely, and intended to cause Plaintiffs to rely, on these misrepresentations as well as other misrepresentations and/or omissions described herein.

71.     Dewan, Global Resources and Burnett, in breach of the applicable contract provisions, failed to provide these opportunities for employment and/or green cards in the United States.

72.     Dewan, Global Resources and Burnett knew, or should have known, that breaching these contractual provisions, as well as other contractually binding promises, would cause Plaintiffs to suffer severe emotional distress.

73.     The contracts signed by Plaintiffs and other documents provided to Plaintiffs by Dewan, Global Resources and Burnett promised that Plaintiffs would receive a

13

refund of all or substantially all of their payments if Plaintiffs did not receive green cards as promised.

74.     Dewan, Global Resources and Burnett knew or should have known that they would not refund Plaintiffs' payments as promised and, in breach of the applicable contract provisions, refused to refund Plaintiffs' payments upon request.

75.     After Plaintiffs signed contracts with Dewan, Global Resources and Burnett, each Plaintiff made the first, and in some cases the second, installment payments required by these contracts.  Plaintiffs were required to divide each installment into three equal parts and make separate payments to Dewan, Global Resources and Burnett.

76.     After Plaintiffs made the first installment payments, these Defendants generally failed to provide Plaintiffs with updates regarding the status of their green card applications for more than a year.  When some Plaintiffs contacted these Defendants at various times between mid-2004 and mid-2006 to check on the progress of their green card applications, the Defendants described purported reasons for the delays but assured Plaintiffs that the green card process was going forward.

77.     During this time, Plaintiffs continued to accrue substantial interest on the money they had borrowed to make the first installment payments.

78.     At various times in 2005 and early 2006, Dewan, Global Resources and Burnett notified Plaintiffs that the labor certifications required for their green card applications had been approved by the U.S. government.  After this notification, Dewan, Global Resources and Burnett collected the second installment payments from Plaintiffs.

*The Recruitment Process For Signal*

79.     After Hurricane Katrina struck in August 2005, Signal required laborers to replace Signal employees who had been displaced by the storm and to fulfill the demand for repairs and fabrication caused by damage from the storm.

80.     In or around May or June 2006, Signal authorized Dewan, Global Resources and Burnett to act as its agents in India and the United Arab Emirates for the purpose of recruiting Indian welders and fitters.

81.     Signal further authorized its agents to represent that Signal would assume, from J & M Associates, sponsorship of the pending green card applications on behalf of Plaintiffs and others, and that Signal would apply for at least two H-2B visa extensions on behalf of all the Indian H-2B workers, including Plaintiffs, to allow them to remain in the United States working for Signal while their green card applications were being processed.

82.     Signal authorized its agents to make these representations even though it knew and had reason to know that such visa extensions and green card applications would not have been valid and bona fide under U.S. immigration law, and even though it did not intend to apply for such visa extensions or green cards on behalf of all the Indian H-2B workers, including Plaintiffs.

83.     In 2006, Plaintiffs spoke with Dewan, Global Resources and Burnett over the phone or in person regarding their long-pending green card applications.

84.     In these communications, Dewan, Global Resources and Burnett offered Plaintiffs the opportunity to pursue their green cards under the sponsorship of Signal, rather than J & M Associates as previously agreed.  Plaintiffs were told that they could quickly obtain H-2B visas to go to the United States for work at Signal's operations.

15

85. Many Plaintiffs were required to pay an additional sum of approximately 30,000 to 150,000 rupees ($500 to $3,000) for this opportunity.

86. Plaintiffs were told that if they did not want to work for Signal, they could either abandon the recruitment process, forfeiting all or most of the payments they had already made, or continue to wait for the opportunity with J & M Associates.

87. Acting as Signal's agents, Dewan, Global Resources and Burnett falsely assured Plaintiffs that they would continue pursuing Plaintiffs' green cards while Plaintiffs worked for Signal, that Signal would seek at least two extensions of Plaintiffs' temporary H-2B visas and that the H-2B visas would thereafter be converted to green cards.

88. Acting as Signal's agents, Dewan, Global Resources and Burnett failed to disclose material facts regarding the H-2B visa, including the fact that H-2B visas confer only a temporary non-immigrant status and the fact that applying for H-2B visa status is fundamentally incompatible with simultaneously applying for a green card.

89. In reliance on the representations of Dewan, Global Resources and Burnett, Plaintiffs, who were unaware of U.S. immigration law and the temporary nature of H-2B visas and who did not wish to forfeit the substantial fees they had already paid, agreed to transfer their green card applications to Signal's sponsorship and further agreed to work for Signal under H-2B visas.

90. In May and June 2006, Burnett, on behalf of Signal, prepared and submitted to the Mississippi Department of Employment and the United States Department of Labor completed forms ETA 750 and attachments (the "ETA 750 forms") seeking to hire Plaintiffs under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant regulations 8 C.F.R.

§ 214.2(h)(6) and 20 C.F.R. § 655.3, and associated administrative letters and or guidance (commonly known and referred to herein as the "H-2B guestworker program").

91.     The H-2B guestworker program permits U.S. employers that have first obtained temporary labor certifications to bring foreign workers to the United States on temporary visas to meet labor needs when employers attest that they cannot find qualified U.S. workers to perform the available jobs.

92.     H-2B visas are non-immigrant visas.  They are only valid for work with the specific employer listed on the visa, and they do not provide portable or transferable employment authorization for the foreign worker.

93.     The ETA 750 forms state that "[t]o knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by a $10,000 fine or 5 years in the penitentiary, or both."

94.     Signal personnel swore, under pain of perjury, to the veracity of the information contained in the ETA 750 forms.

95.     Burnett and Signal stated in the ETA 750 forms that Signal sought workers to perform jobs including welding and fitting.

96.     Burnett and Signal stated in the ETA 750 forms that Signal would employ workers from October 1, 2006 to July 31, 2007, even though they knew that Signal's labor need was projected to be at least two to three years.

97.     Signal stated in the ETA 750 forms that its need for H-2B guestworkers was caused by "peak load" and a "one-time occurrence demand for labor in excess of that which [its] employees can effectively provide," and that "the temporary workers will not become a part of the permanent workforce," but instead "will work for the length of the prescribed dates of

17

need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

98.     In summer of 2006, the U.S. Department of Labor approved Signal's labor certification applications for 590 workers for the period of October 1, 2006 through July 31, 2007.

99.     In July and August of 2006, Burnett, on behalf of Signal, filed with the U.S. Citizenship and Immigration Service ("USCIS") completed I-129 forms and attachments seeking 590 H-2B visas for Indian workers, including Plaintiffs.  In these H-2B visa applications, Signal and Burnett misrepresented the duration of Signal's labor need.

100.    Signal attested that its labor need ran for ten months from October 1, 2006 through July 31, 2007, even though Signal expected its labor need to last at least two to three years.  Signal falsely represented to the government that it intended to return all H-2B visa recipients to India after ten months.

101.    Burnett declared that the H-2B applications were based on information of which he had knowledge, even though he knew that Signal intended to employ Plaintiffs for more than ten months.

102.    Signal's and Burnett's representations to the government on the H-2B visa applications were knowingly false, and the very fact that they were applying for temporary work visas was inconsistent with their representations to Plaintiffs that they would pursue green cards and permanent residency for them.

### The Conclusion Of The Recruitment Process

103.    During 2006, Signal personnel, along with Dewan, traveled to India and the United Arab Emirates to test Plaintiffs' welding and pipefitting skills.

104.    Plaintiffs paid travel costs and admission fees to take these tests.

105.   Before securing H-2B visas, Plaintiffs were interviewed by U.S. consulate officials in Indian cities including Chennai and Mumbai.

106.   Plaintiffs paid to travel from their homes or current places of employment to these interviews.

107.   Dewan, Global Resources and Burnett, acting as Signal's agents, required Plaintiffs to meet with them and, in some instances, Signal personnel, before the consulate interviews.

108.   At these pre-interview meetings, Dewan, Global Resources and Burnett ensured that Plaintiffs were current on the fee installments required by their contracts.

109.   Dewan, Global Resources and Burnett required Plaintiffs to sign documents permitting Sachin Dewan to receive their visa-stamped passports from the U.S. consulate on behalf of Plaintiffs.

110.   Dewan, Global Resources, Burnett and Signal personnel coached Plaintiffs on what to say during consulate interviews.

111.   Dewan, Global Resources, Burnett and Signal personnel told Plaintiffs that if they did not follow these instructions regarding the interviews, none of Plaintiffs would receive visas and they would lose the opportunity to permanently immigrate to the United States and forfeit all previous payments.

112.   During Plaintiffs' consulate interviews, the consulate officials took Plaintiffs' passports from them for visa processing.

113.   By fall 2006, the USCIS approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

114.    Once Plaintiffs' visas were approved, consulate officials sent Plaintiffs' passports, with H-2B visas affixed, directly to Sachin Dewan.

115.    After Plaintiffs' visas were approved, Dewan and Global Resources arranged Plaintiffs' travel to the United States.

116.    Plaintiffs paid Dewan and Global Resources for making these arrangements.

117.    Before Plaintiffs could leave for the United States, they were required to attend final meetings in Dewan's Mumbai office.

118.    These meetings typically took place just hours before Plaintiffs' scheduled departures to the United States.

119.    During these meetings, Dewan's office was crowded with Indian workers awaiting departure to the United States.

120.    At these meetings, Dewan collected the final installment payments required by Plaintiffs' contracts.  Dewan also demanded that Plaintiffs return any receipts, agreements or other documentation they had received from him during the recruitment process.

121.    Dewan also required Plaintiffs, most of whom do not proficiently read or speak English, to sign documents written in English, with little or no time to review them. Sachin Dewan and his staff demanded that Plaintiffs sign these documents quickly.

122.    Because of these demands and because their flights to the United States were about to depart, Plaintiffs signed the documents.

123.    Plaintiffs had no reasonable opportunity to review, negotiate or make any changes to the English documents presented to them.

20

124.    Dewan did not return Plaintiffs' passports until after Plaintiffs had paid the final installments and signed the mandatory paperwork.

125.    Dewan had intimidating employees or associates present in his office during these final collections and at least one Plaintiff heard Sachin Dewan yelling at other recruited workers.

126.    Based on Dewan's threatening and coercive behavior during these pre-departure meetings in Mumbai, Dewan's possession of Plaintiffs' passports and the extraordinary and increasing levels of debt they had incurred to pay Dewan, Global Resources and Burnett for green card and H-2B visa arrangements, Plaintiffs reasonably believed that they had no choice but to make the final required payments and to travel to the United States to work for Signal.

127.    Plaintiffs would not have paid the exorbitant fees charged by Dewan, Global Resources and Burnett for travel, green cards, visas and employment opportunities had they known that Defendants' promises and representations were false, and that Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

### Living And Working Conditions At The Signal Facilities In Pascagoula, Mississippi

128.    Plaintiffs and more than five hundred other Indian H-2B workers traveled from Mumbai to Signal's operations in the United States at various times from late October 2006 to April 2007 on tickets arranged by Dewan and Global Resources.

129.    Approximately 300 of these workers, including Plaintiffs, were sent to Signal's facility in Pascagoula, Mississippi.

130.    Dewan, Global Resources and Burnett knew, or should have known, of the poor conditions in the camp and misrepresented and/or omitted to disclose these conditions to Plaintiffs.

21

131. Had Plaintiffs known of the conditions in the camp, each would not have contracted with Dewan, Global Resources and Burnett.

### Unsuitable Housing

132. Signal constructed a labor camp in fall 2006 to house Indian workers. Signal employees and management referred to the Pascagoula camp as "the Reservation." Plaintiffs were required to live in the camp.

133. The Pascagoula camp was isolated, overcrowded, unsanitary and not suitable for human habitation.

134. Signal crowded sixteen to twenty-four men into each of the camp's housing units. The bunk beds were so tightly packed that Plaintiffs could barely walk between them. The top bunks were so close to the ceiling, and the bottom bunks so close to the top bunks, that Plaintiffs could barely sit up in their beds.

135. The housing units had insufficient toilet and showering facilities. Lines for the bathroom were consistently very long and Plaintiffs had to wait in line for hours to use the toilet. With three or fewer showers per housing unit, hot water ran out quickly and Plaintiffs were often only able to take cold showers after their long waits in line.

136. The housing units had little or no space to store personal belongings. Plaintiffs instead often kept their clothing -- even if wet and soiled from work -- in bed with them because there was no other place to put it.

137. The housing units provided no privacy. Sleep was difficult due to the noise from such close quarters, oppressive smells and the comings and goings of workers who worked on different shifts. Workers, including some Plaintiffs, saw rats and mice in their sleeping areas and a wasps' nest in one housing unit.

138.    The camp failed to meet the standards set by the federal government's Occupational Safety and Health Administration ("OSHA"). For example, the OSHA guidelines state that bunkhouses of similar purpose should have at least fifty square feet of floor space per person. Signal's housing units offered less than eighteen square feet of floor space per person. The guidelines also require bunk beds to be at least forty-eight inches apart from other beds. Signal's bunk beds were so tightly packed together that workers were essentially sleeping next to each other.

139.    Workers, including some Plaintiffs, told Signal personnel on numerous occasions that they found these conditions to be intolerable.

140.    Internal communications among Signal personnel discussed the "overcrowding," acknowledging that the Pascagoula camp needed at least three more housing units, as well as more toilets and sinks.

### Poor Quality Food

141.    The food provided by Signal was unhealthy, unpleasant and often rotten. Meals were offered exclusively in a cafeteria, which was only open during limited hours and which would sometimes run out of food. Workers who were able to get food before it ran out were often served food that had spoiled. Some Plaintiffs observed unsanitary conditions in the kitchen and during food preparation. Meat was left uncovered and unrefrigerated, and because the kitchen was infested with vermin, insects got into the food as it was being prepared.

142.    Workers frequently complained to Signal personnel that the food was so bad that they were left hungry. Others complained to Signal that the food was making them physically ill.

143.    Signal personnel told workers, including Plaintiff Padinhare, that they should not complain because the food was better in the camp than the food in India.

23

144.     In an email to other Signal personnel, Signal Senior Vice President and General Manager Ron Schnoor acknowledged the "bad, stale, molded, and otherwise poor quality food."

### Illness

145.     Workers frequently became severely ill.  For example, Plaintiff Shaikh became violently ill on three occasions.  His doctor advised him that his repeated illnesses were due to unsanitary food and living conditions.

146.     Plaintiff Meledan developed chronic chest pain after arriving at the camp. His doctor advised him that this chest pain was due to the camp's unhealthy food.

147.     Signal personnel were aware of Plaintiffs' health problems.  One Signal employee wrote in a journal that:

> [o]ur Indians have been dropping with sickness like flies. . . . [They] are getting worried and believe there are unhealthful conditions in the camp. It is true. The reason is because the plumbing was so shoddily done by GE's subcontractors, and water has leaked everywhere and stagnated as a result, which serves as a bacterial breeding ground.

### Constant And Invasive Monitoring

148.     The camp was located in an isolated industrial area far from other residential communities, shopping facilities, houses of worship and other basic amenities.

149.     The camp was enclosed by fences and barbed wire and was accessible only by a few entrances, which were watched by security guards at all times.

150.     When leaving or entering the camp, Plaintiffs were required to show identification, tell the guards where they were going to or coming from, and subject themselves and their belongings to search.  Plaintiffs' movements into and out of the camp were recorded.

151.     Posters around the camp featured pictures of cameras and the words "I'm watching you."

152.   Guests normally were not permitted in the camp, and Plaintiffs were permitted visitors only in the parking lot.  Plaintiffs were specifically prohibited from receiving visitors from not-for-profit organizations that might advise Plaintiffs of their rights under state and federal law or provide other supportive services.

153.   Because the camp was isolated, Plaintiffs generally had to rely on Signal-provided transportation to take them to populated areas, which Signal only offered after workers had been at the camp for some time.  But Signal would generally only provide transportation to Wal-Mart or the bank.  Even then, Plaintiffs had little privacy because Signal security would sometimes follow them into Wal-Mart.

154.   Signal's private security forces entered Plaintiffs' housing units at night. Signal personnel and camp security guards conducted searches of the housing units, including searches of workers' personal belongings.

155.   Plaintiffs were not told when these searches would be conducted and were not told what Signal was looking for.

156.   Signal prohibited Plaintiffs from bringing food into the housing units.

157.   Signal prohibited Plaintiffs from drinking alcohol at the camp.  Violation of this prohibition or other rules subjected the workers to fines of $250 and suspension from work. Repeat "offenses" were punishable by a $500 fine.

158.   Signal did not bar its non-Indian workers from having visitors or drinking alcohol in their homes.  Nor did Signal confine its non-Indian workers to crowded housing units or subject them to surveillance and searches of their homes and belongings.

### *Excessive Charges For Housing And Food*

159.   Signal charged Plaintiffs and other Indian workers $35 dollars per day (approximately $1,050 per month) for room and board.  The mandatory $35 daily fee was deducted automatically from Plaintiffs' paychecks.

160.   Before the $35 per day value was set, Signal's Senior Vice President and General Manager Ronald Schnoor recommended that Signal charge the workers even more, $53.50 per day, an amount that would have amortized the entire multi-million dollar cost of the camps in Pascagoula, Mississippi and Orange, Texas in just ten months.

161.   In the email containing this recommendation, Schnoor stated that Plaintiffs and their fellow workers would all be "happy campers" because Signal's living arrangements and wages were likely to be an improvement over conditions in India, in that Plaintiffs' net pay, after taxes and living expenses, would be "nearly 11 times more per day than they are currently making," that "[a]ll they'll have to do is roll out of bed and walk to work," and that "[v]irtually everything else is taken care of for them."

162.   After a short time in the camp, workers (including certain Plaintiffs) began complaining about the poor conditions and asked to live outside the camp.  In response, Signal informed Plaintiffs that if they lived elsewhere, there would be no transportation to bring them to work and that Signal would continue to deduct $35 per day from their paychecks.

163.   Given their substantial debts, this wage deduction left Plaintiffs with no choice but to remain at the camp.

164.   By exploiting Plaintiffs' tenuous financial position, heavy debt load, precarious immigration situation and fear of job loss, Signal assured that Plaintiffs and their Indian coworkers would have no choice but to continue working at the company and living at the Pascagoula camp.

165.   Signal did not require any non-Indian workers to pay for Signal's capital expenditures, nor did it require any non-Indian workers to pay for living expenses while they were not living in Signal-provided housing.

166.   In contrast, workers who were not of Indian race, ethnicity or nationality were not required, or even allowed, to live in Signal housing, and were not forced to pay for room and board at the camp.

### Discrimination Due To Race, Ethnicity, Religion And Nationality

167.   Signal employees, including supervisors, frequently used offensive and racist language in speaking or referring to Plaintiffs and other Indian workers.

168.   In an email to other Signal personnel, Signal employee Darrell Snyder said that it was a "misguided notion that some of these Indians can be reasoned with" and said that if he "stayed involved with the camp," he would "most definitely go on a rat hunt" in the camp to find the "very small number [of] these employees [who] are not going to change and . . . need to go."

169.   Signal also disrespected Plaintiffs' religious beliefs.  For example, Plaintiff Shaikh, a Muslim, asked for time and a small space to pray.  Signal denied his request, such that Shaikh prayed very early in the morning -- before the start of the work day -- and at night after work, in his cramped housing unit.

170.   Additionally, the religious beliefs of many Plaintiffs prohibit the consumption of beef or pork.  Rather than accommodating Plaintiffs' religious dietary restrictions, Signal continued to serve beef and pork, so that on some days, certain Plaintiffs could not eat without violating their religious beliefs.

171.   Signal also forced Indian workers, including Plaintiffs, to work under conditions that were harder and more dangerous than the jobs Signal assigned to non-Indian

workers. For example, Indian workers were assigned to work in small, smoke-filled tanks that lacked ventilation or in oily places on the rigs where it was easy to fall. Workers not of Indian race, ethnicity or nationality were not given such dangerous work.

172.   When Indian workers complained about these unsafe and illegal conditions, Signal demoted them, suspended them without pay or threatened to deport them. Plaintiffs were told that some workers who had complained about the working conditions were sent back to India. Workers not of Indian race, ethnicity or nationality were not treated this way.

173.   Defendants' discriminatory treatment of Plaintiffs and other Indian workers was motivated by racial, ethnic and religious animus, as well as an animus against those of Indian national origin.

### Signal, Dewan And Burnett Continued To Mislead Plaintiffs

174.   At the camp in Mississippi, Malvern Burnett and Signal personnel frequently met with workers who asked about their applications for green cards. During these meetings, Plaintiffs and other workers told Signal personnel that Dewan, Burnett, Global Resources and Signal personnel in India had promised that Signal would apply for and help the workers obtain green cards and that the workers had paid as much as $16,000 for that opportunity.

175.   Rather than tell these workers that Signal had not applied for green cards on their behalf, and had no intention to do so, Signal continued to deceive the workers into believing that Signal would apply for and help them obtain green cards, telling Plaintiffs that their green card applications were processing.

176.   In or about January 2007, Sachin Dewan and Malvern Burnett traveled to the camp and, with Signal personnel present, told Plaintiffs and other Indian workers that Signal would provide each Indian worker, including Plaintiffs, with a green card.

28

177.   Beginning before this meeting and continuing throughout 2007, Signal employees consulted with each other and with Signal's agents about what to tell workers, including Plaintiffs, about the status of their visas and green card applications.

178.   Although Burnett agreed to assist in filing green card applications on behalf of Plaintiffs in exchange for the fees they paid him, he never did so.  Further, after Plaintiffs arrived in the United States and began working for Signal on H-2B visas, Burnett refused to file green card applications on their behalf, or insisted on being paid even more money to do so.

179.   Burnett had represented to the Indian workers, including Plaintiffs, that no additional fees would be required for his immigration services beyond those paid in India. However, after their arrival, Burnett charged the workers additional amounts for advice concerning immigration to the United States.

180.   After one worker stopped payment on a check to Burnett in December 2006, Burnett considered threatening Plaintiffs and other workers with "immediate deportation" to prevent other stopped payments.

181.   In sum, Signal personnel, along with Dewan and Burnett, continued to falsely represent to Plaintiffs that Signal would sponsor their green card applications even when Plaintiffs were already in Mississippi working for Signal on H-2B visas.

182.   Signal also did nothing to address the fact that Plaintiffs' temporary employment at Signal was not economically justifiable in light of the debt Plaintiffs had incurred and the mandatory $35 per day deduction for room and board.

183.    By November 2006, shortly after the first workers arrived in Pascagoula, Signal personnel learned that each worker had paid high recruitment fees to Dewan, Global Resources and Burnett.

184.    After learning of the fees, Signal terminated its relationship with Global Resources, but continued to work with Dewan and Burnett.

185.    Signal personnel believed that these fees were excessive and caused low morale among the Indian workers, but Signal did not solve this problem and did not take steps to stop Dewan and Burnett from collecting those fees.

186.    Signal sent a letter to Dewan and Burnett asking them to refund half of the fees that they had received, but Signal did not terminate its relationship with Dewan or Burnett, and Signal did not impose any penalty or withhold any payment when Dewan and Burnett refused to comply. Nor did Signal take action after Burnett asserted to Signal that Dewan had refunded the workers' money, and furnished affidavits signed by workers stating that they never paid any fees, even though Signal personnel believed that both claims were false.

187.    Even after learning of the high recruitment fees, Signal continued to hire workers, including certain Plaintiffs, through Dewan and Burnett.

188.    Signal did not itself refund the fees or mitigate the costs incurred by Plaintiffs because of the fees.

189.    Signal's inaction after discovering the fees, coupled with its decision to continue working with Dewan and Burnett after learning of the fees, ratified the conduct of its agents.

***Signal Attempted To Send Several Workers Back To***
***India To Intimidate Plaintiffs And Deter Further Complaints***

190.    By spring 2007, Plaintiffs began to consider ways to convince Signal to improve the conditions and sought outside advice from attorneys and local churches.

191.    Signal intentionally created a climate of fear and intimidation to cause Plaintiffs to stop complaining about the camp and their treatment at Signal.

192.    Signal personnel told the Indian workers that if they got out of line or asked too many questions, Signal would prevent them from receiving their promised green cards and would prevent them from accessing their bank accounts.  When Signal learned that some workers had contacted an attorney, Signal threatened to send the most vocal workers back to India.

193.    Sachin Dewan called the wife of one vocal worker, Sabulal Vijayan, in India, warning her to tell her husband to stop making trouble at Signal.  As Plaintiffs and other workers learned of this call, they began to fear that Defendants would retaliate against them and their families if they complained about the living and working conditions at Signal or tried to leave.  For example, Plaintiff Shaw learned of this threat and became concerned that Sachin Dewan would harass Shaw's family in India because Sachin Dewan was very powerful and well-connected and knew Shaw's family address in India.

194.    Signal escalated its pressure on the workers.  In a meeting with Malvern Burnett and the workers, including Plaintiffs, on or about March 8, 2007, Signal management told them that Signal had powerful lawyers and would fight back against any "organizing" efforts, and that Signal would not extend any of the workers' H-2B visas if a single worker took legal action against Signal.

31

195.   On the same day, Signal decided to terminate five of the "camp leaders" and forcibly send them back to India "to make an example of these men to the other Indians."

196.   Early in the morning of March 9, 2007, when the workers for both the day and night shifts were present at the camp, Signal locked the gate to the camp, blocking the exits. Signal personnel, including several security guards, then swept through the housing units carrying pictures of the workers targeted for termination. Because Signal personnel could not tell the workers apart from each other, they accosted numerous workers, including Plaintiff Shukla, to determine whether they were among the people shown in the pictures.

197.   By 6:00 a.m., Signal had identified the five workers, taken them into "custody" in a side room, and told them that they were fired and would be deported. Distraught at what that meant for him and his family, one of the workers, Sabulal Vijayan, attempted to commit suicide by slashing his wrists. Several Plaintiffs observed Signal personnel carrying Vijayan, covered in blood, out of the side room. Several Plaintiffs saw the other four workers who were being detained through a window and became frightened that they too might be detained.

198.   The incidents of March 9, 2007, or "Black Friday" as some workers call it, caused Plaintiffs to fear what Signal would do to them if they expressed concerns about conditions at the camp. Plaintiffs believed, based on Signal's conduct, that requesting improved conditions or asserting their rights to the same would lead to arrest, imprisonment, bodily harm and deportation back to India.

### Signal, Burnett And Dewan Used Fraudulent And Coercive Tactics To Prevent Plaintiffs From Leaving The Pascagoula Camp

199.   Even after Black Friday, Signal continued to use fraudulent and coercive tactics to control Plaintiffs and other workers.

200.   For example, Signal personnel continued to falsely assure these workers that Signal was working on their visa renewals and green card applications.

201.   Additionally, Signal personnel threatened the workers, telling them that if any of them filed a lawsuit against Signal, Signal would refuse to extend H-2B visas for every worker and would send all of the workers back to India.  Signal knew that this threat would coerce the workers, including Plaintiffs, into staying at the camp, because the workers would not be able to repay their debts if they were forced to return to India.

202.   Despite the threats and false promises, more than 75 percent of the Indian workers had left Signal's Pascagoula camp by December 2008.  Some were terminated.  Others left of their own accord, sometimes escaping in the middle of the night without their belongings.

203.   No Plaintiff received a green card through any efforts of Signal or its agents, none of whom ever even applied for a green card on behalf of any Plaintiff.

## Plaintiffs Each Relied On The Defendants' Representations

### Plaintiff George Paily Paulose Chakkiyattil

204.   In or about February 2005, Chakkiyattil returned from a pipefitting job in the Middle East to his home in Kerala, India and saw an advertisement Dewan Consultants placed in a local Indian newspaper, *Malayala Manorama*.  The advertisement offered jobs to skilled pipefitters in the United States, along with permanent residency for candidates and their families.

205.   Over a period of several days, Chakkiyattil attended an informational seminar at the Trident Hilton Hotel in Kochi, India, along with many other candidates.  There, Sachin Dewan explained the opportunity to work for a company called J & M Associates.  Dewan's agent, Salimon, was also in attendance, along with Pol and Malvern Burnett.  These men explained that the process for obtaining a green card would require payment of associated

33

fees, in three installments. The cost was contrasted with the salary the candidates would receive from J & M Associates: forty hours per week at $16 per hour, twenty hours per week at $21 per hour and a $60 per diem for a six-day work week, for a total of $1,420 per week. Sachin Dewan handed out offer letters stating these terms and conditions of employment.

206.   After the seminar, Chakkiyattil received several phone calls from Dewan. Chakkiyattil and his family had decided not to participate due to the high cost. Dewan's agent, Salimon, convinced Chakkiyattil to pay a small down payment of 25,000 rupees that would be credited toward the first installment payment. In the meantime, Chakkiyattil could take the trade test in Kochi. Chakkiyattil agreed and paid the 25,000 rupees, in addition to 2,000 rupees to take the test. To cover these costs, Chakkiyattil sold his wife's jewelry and took out a loan from a bank at an approximate 11 percent interest rate. Chakkiyattil passed the trade test and decided to pursue the opportunity to work in the United States.

207.   Chakkiyattil was required to make three installment payments, to be made each time to each of Sachin Dewan, Global Resources and Malvern Burnett. Each time, Chakkiyattil paid $1,250 to Global Resources and Malvern Burnett, and separately paid 55,555 rupees in cash to Sachin Dewan. Sachin Dewan refused to give Chakkiyattil a receipt for the cash payments without imposing a surcharge.

208.   On or about March 23, 2005, Chakkiyattil paid the first installment. To make the payment, Chakkiyattil sold his wife's gold jewelry from their wedding and borrowed from a lending bank.

209.   For many months thereafter, Chakkiyattil received no communications from Dewan. In or about January 2006, Dewan called Chakkiyattil's home to report that he had received his labor certification and that his second installment payment was therefore due.

34

Chakkiyattil's family took out a second loan from the same bank and Chakkiyattil's wife paid the second installment.

210.     Many more months passed without any word from Dewan.  Chakkiyattil frequently called Dewan and received many excuses about delays due to the elections in the United States and Hurricane Katrina.  Chakkiyattil began to see new advertisements placed by Dewan Consultants, again offering employment for the same positions as before.  He also heard from friends that Dewan Consultants had started a new recruitment cycle.  Chakkiyattil went to Dewan Consultants' offices in Kerala at least four times, asking about the status of his green card.  Chakkiyattil also asked for a refund and was told that Dewan Consultants already spent the money that Chakkiyattil had paid it and, in any event, if he were to get a refund, Dewan Consultants would keep 20 percent as a processing fee.

211.     On one such trip to the offices, Dewan's agent, Salimon, told Chakkiyattil to forget about working for J & M Associates for now, since there was a new opportunity to work for a different company in the United States on an H-2B visa for an additional 100,000 rupees.  This new company would instead process Chakkiyattil's green card and, after working there for a time, he could return to India to bring his family with him.  Chakkiyattil could not afford to lose 20 percent of the money he had invested for this opportunity.  Desperate with no job and mounting debt, Chakkiyattil felt that he had no choice but to accept this offer.

212.     Dewan's agent, Salimon, scheduled a second trade test for Chakkiyattil, this time for the new company in the United States.  Chakkiyattil paid for his train ticket to and from Chennai for the test, costing him approximately 4,000 rupees.  Salimon and other agents of Dewan Consultants attended the test, where Chakkiyattil learned about the new company, Signal. The applicants were told that they would receive ten-month H-2B visas, which would be

renewed for an additional ten months, and that Signal would complete the applicants' green card

applications.

213.    Sachin Dewan later instructed Chakkiyattil that his interview at the U.S.

consulate was set for November 4, 2006.  In addition to the fees he had already paid,

Chakkiyattil spent approximately 25,000 rupees preparing the paperwork for the interview, 5,000

rupees traveling to the interview, and was required to bring two demand drafts with him -- one

for 4,800 rupees and the other for 5,000 rupees -- to cover government charges.  Prior to the

interview, Chakkiyattil went to Park Hotel in Chennai to meet with Sachin Dewan, Dewan's

agent, Salimon, Malvern Burnett and two Signal personnel.  Prior to the interview, Sachin

Dewan and Malvern Burnett instructed Chakkiyattil and the other applicants not to say anything

about the money that they had paid for the visa opportunity.

214.    At the end of the consulate interview, the interviewer explained that he

would mail Chakkiyattil's passport to him at his home.  Chakkiyattil never received his passport

in the mail.  Instead, he later learned that Malvern Burnett had somehow obtained his passport

and given it to Sachin Dewan.

215.    On or about November 26, 2006, Chakkiyattil received a phone call from

Dewan suddenly informing him that he would be leaving for the United States the following day.

He was instructed to bring the third installment payment, the additional fee for the H-2B visa and

all originals of his agreements and receipts with him.  With no time to prepare and take a train to

Mumbai, Chakkiyattil purchased a plane ticket for approximately 14,000 rupees and traveled to

Mumbai.

216.    Upon arrival at the Mumbai offices of Dewan Consultants, Chakkiyattil

was asked for his original documents and receipts.  The documents were confiscated, and

36

Chakkiyattil was told that he would not need them anymore because Signal, and not J & M Associates, would be processing his green card application. When Chakkiyattil demanded that the documents be returned, Sachin Dewan told him that he would not receive his passport if he refused to relinquish the documents. Chakkiyattil was then required to sign additional documents that he had no time to read and did not receive copies of after signing. He also provided a thumbprint and was told that it was for his green card application. With the pressures of his mounting debt and his impending departure time, Chakkiyattil had no choice but to acquiesce to Sachin Dewan's demands. Chakkiyattil paid the third installment and received his plane ticket and passport. Chakkiyattil rushed to the airport in a taxi to board his plane.

217.    In total, Chakkiyattil paid over $13,500 to Sachin Dewan, Global Resources and Malvern Burnett. In addition to the fees and interest that Chakkiyattil paid, he also incurred expenses totaling over $1,350. To finance such payments, Chakkiyattil borrowed large sums of money and paid exorbitant interest rates, both from banks and a high-interest moneylender with connections to organized crime.

218.    At the Signal camp in Mississippi, the Signal personnel supervising the Indian workers often urged Chakkiyattil and the other workers to skip time-consuming safety measures, including steps required by OSHA. For example, OSHA requires that anyone performing Chakkiyattil's job duties work with a partner. On many occasions, Chakkiyattil was required to do such work alone.

219.    Chakkiyattil is a devout Christian and considers Sunday to be his Sabbath, during which no work is permitted. While at Signal, he was often required to work on Sundays in violation of his religious beliefs.

37

220.    In India, Chakkiyattil's family was harassed by Dewan.  At one point, Chakkiyattil's ailing wife received a call from Dewan's agent, Salimon, urging Chakkiyattil to stop causing trouble.  In addition, his wife was being harassed by the bank from which they had borrowed the large sums of money to pay Sachin Dewan, Global Resources and Malvern Burnett.

221.    In or about April 2007, Chakkiyattil traveled back to India to take care of his ailing wife because Signal did not have work for all of the workers.  The bank that lent Chakkiyattil money threatened to foreclose on his home and evict his family, greatly distressing his wife.  Chakkiyattil took his wife to a hospital where she underwent treatment and brought her home thereafter because he did not have any money to pay for her to receive continued hospital care.  With great difficulty, Chakkiyattil renegotiated the bank loan and paid down some of the interest.  On or about June 13, 2007, Chakkiyattil returned to the United States and his job at Signal, still hoping for the opportunity to obtain a green card.

222.    Thereafter, Chakkiyattil learned that Malvern Burnett had never filed the proper paperwork for Chakkiyattil and the other workers to obtain green cards.  Malvern Burnett said he was no longer able to submit a green card application for J & M Associates due to a "conflict of interest" which resulted from Malvern Burnett acting as the attorney for both Signal and J & M Associates.

### *Plaintiff Chandrasekhara Pillai Rajesh Chemmanappilly*

223.    In early 2005, while working as a pipefitter in Saudi Arabia, Chemmanappilly first learned, through a friend, of the opportunity to work for J & M Associates in the United States and obtain a green card.  Chemmanappilly called Dewan Consultants' offices in Kottayam, India and was put in touch with Dewan's agent, Salimon.  Through Salimon, Chemmanappilly learned that the opportunity involved obtaining a labor certification followed

38

by a green card. Salimon explained that Chemmanappilly would be required to make three installment payments totaling 600,000 to 700,000 rupees. Payments were to be made separately in demand drafts to Sachin Dewan, Global Resources and Malvern Burnett. Because other applicants had started the process much earlier, Salimon told Chemmanappilly that he would have to pay the first two installments up front and at once.

224.    In or about mid-2005, Chemmanappilly paid the first two installments. The first payment consisted of three demand drafts in the amount of $1,250 for each of Sachin Dewan, Global Resources and Malvern Burnett. The second payment consisted of three demand drafts in the amount of $1,460 for each of Sachin Dewan, Global Resources and Malvern Burnett.

225.    In or about February or March 2006, Dewan's agent, Salimon, called Chemmanappilly's brother-in-law in India and told him that everything "was good" and that Chemmanappilly needed to "come fast" for the job in the United States. At the time, Chemmanappilly had a good job in Saudi Arabia that he was reluctant to leave without assurances about his future in the United States. After receiving assurances from Salimon about the work opportunity and permanent residency in the United States, Chemmanappilly quit his job and returned to India in or about June or July 2006.

226.    On his return, Chemmanappilly experienced further delays. In the meantime, Chemmanappilly was unemployed and not earning any income. Finally, in or about late October 2006, Dewan's agent, Salimon, contacted Chemmanappilly and told him of the opportunity to work at Signal. Salimon told Chemmanappilly that while he would still obtain a green card eventually, the Signal opportunity was different than the J & M opportunity because he would travel to the United States on an H-2B visa. Salimon said they would need to transfer

another worker's labor certification to Chemmanappilly at an additional cost to him of 25,000 rupees, and that Malvern Burnett would handle the papers for the job with Signal.

227.    In or about late October 2006, Chemmanappilly attended a meeting at the Hilton Hotel in Kochi, India where he was told the details of the Signal employment. Sachin Dewan explained that Chemmanappilly would travel to the United States on an H-2B visa, that the visa would be automatically renewed after its expiration, and that Chemmanappilly would later receive a green card.

228.    In or about late October or early November 2006, Chemmanappilly traveled to Chennai for an interview and trade test with several Signal personnel. Signal personnel told Chemmanappilly about the fabrication work done by Signal on oil rigs and that the company would provide food and accommodations. After the interview and test, Dewan contacted Chemmanappilly to tell him he had been hired and would need to be interviewed at the U.S. consulate in Chennai for his work visa.

229.    In or about early November 2006, Chemmanappilly traveled to Chennai for his consulate interview. Before the interview, Chemmanappilly met with Sachin Dewan, Dewan's agent, Salimon, and Malvern Burnett. Malvern Burnett told Chemmanappilly not to mention his goal of obtaining a green card and not to disclose how much he had paid for his visa opportunity because if he disclosed the amounts, his visa would be denied. Malvern Burnett also told Chemmanappilly that his H-2B visa would be extended twice and then he would receive the green card.

230.    In or about late November 2006, Chemmanappilly learned that his visa had been approved. He traveled to Dewan Consultants' offices in Mumbai to pay his final

40

installment of approximately 200,000 rupees. Upon making the payment, Chemmanappilly

received his passport, with the H-2B visa affixed, and his plane ticket from Sachin Dewan.

 231. In total, Chemmanappilly paid over $13,000 to Sachin Dewan, Global

Resources and Malvern Burnett. Chemmanappilly paid for half with his own funds and

borrowed the rest from his family and by pawning his wife's jewelry.

 232. At the Signal worksite in Mississippi, Chemmanappilly was ostensibly

allowed two breaks each work day. Because Chemmanappilly worked 130 to 150 feet in the air,

he would seldom receive any break because the time it would take to lower him to the rig

platform was counted against his break and would consume the entire time allowed.

 233. Chemmanappilly also learned that there was a chance his H-2B visa would

not be extended. He sought out Malvern Burnett for advice, who referred him to another lawyer

because Burnett now had a "conflict" from his work for Signal. Thus, although Chemmanappilly

had paid Burnett up front for the legal work necessary to get permanent residency in the United

States, Burnett refused to complete the work and sent Chemmanappilly to another lawyer when

he needed assistance in securing his ability to remain lawfully in the United States.

### *Plaintiff Sukumar Moses Dokka*

 234. In or about April 2004, while working as a pipefitter in India, Dokka saw

an advertisement Dewan Consultants placed in a newspaper offering the opportunity to work in

the United States permanently with a green card.

 235. In or about April 2004, in response to the advertisement, Dokka visited

Sachin Dewan at his offices in Mumbai. Sachin Dewan told him about an opportunity to work

for a company called J & M Associates in California and receive a green card. Sachin Dewan

explained that obtaining a green card would be a two-year process, that Dokka would be required

to make three installment payments and that the process would begin as soon as Dokka paid the

first installment.  Dokka would be required to pay the second installment after he received his labor certification, and he would pay the third installment at the end of the process.  Each of the installment payments would be made in the amount of 55,555.55 rupees to each of Sachin Dewan, Global Resources and Malvern Burnett.

236.    Dokka did not have the necessary funds to pay the installments.  To raise the money, he sold some jewelry and some land, but was forced to borrow most of the money.  On or about May 5, 2004, he paid the first installment in the amount of $1,236 to each of Sachin Dewan, Global Resources and Malvern Burnett.

237.    After paying the first installment, Dokka did not hear anything about the process until January 21, 2006 when he received news that his labor certification had been approved.  He was told that the delay was due to Hurricane Katrina, and that J & M Associates would be moving ahead with his visa petition.  Defendants instructed him that he needed to pay the second installment for the process to move forward.  With respect to the payment owed to Global Resources, Dokka was told to have the check made out to Pol instead of Global Resources.  On or about February 17, 2006, Dokka made the second installment payments in the amount of $1,250 to each of Sachin Dewan, Pol and Malvern Burnett.

238.    After paying the second installment, there was another long delay despite Dokka's attempts to obtain information.  Dokka received no information regarding the status of his job with J & M Associates or his green card.  In light of the uncertainty, Dokka accepted a job in Africa.  While working in Africa he continued to attempt to contact Sachin Dewan, Pol and Malvern Burnett without any success.  He eventually heard through friends that the opportunity to work at J & M Associates in California was over, but that there was an opportunity to work at Signal instead.

239.   Dokka eventually made contact and was told he would work for Signal and to return immediately to Dewan Consultants' Mumbai offices.  When he returned, he was sent to Chennai to perform a trade test for Signal personnel.  He was also told he would need to pay an additional 20,000 rupees to pursue the opportunity at Signal.  Sachin Dewan took his passport and told him that Dokka he would return it once Dokka completed his payments.  Dokka again had to borrow money to complete the payments.

240.   In or about November 2006, Dokka was told that he would need to visit the U.S. consulate for an interview in connection with his visa processing.  He was instructed not to reveal to anyone that he had paid money in connection with the visa opportunity.

241.   Dokka traveled to Mississippi on or about December 18, 2006.  At the worksite, Signal personnel treated Dokka and the other Indian workers differently than the other workers.  Signal personnel regularly cursed at Indian workers and warned them that if they did not work hard enough, they would be deported.  Dokka came from a poor town in India and lived in constant fear that he would be deported because he had no means of repaying the loans he had taken out to pursue the opportunity at Signal.   He felt he had no choice but to do whatever he was asked.

242.   At numerous meetings held at the camp, Malvern Burnett continued to assure Dokka that he was working on obtaining his green card, and that Dokka would need to remain at Signal until the process was completed.

243.   On or about November 25, 2007, Dokka left Signal.

### Plaintiff Roy Punakkattu George

244.   In or about February 2004, while working as a pipefitter in Dubai and home on vacation in India, George saw an advertisement in his local newspaper, *Malayala Manorama.* Dewan Consultants posted the advertisement and offered work in the United States

43

for pipefitters. The advertisement stated that the offer was for a permanent position and that all candidates would receive green cards for themselves and for their families. George was attracted to the offer because, while he had a stable job in Dubai, it forced him to live away from his family and this would allow him to work near his family.

245.    George responded to the advertisement and registered to attend a seminar, held at the Trident Hilton in Kochi, India in or about late February 2004. Over 100 other candidates came to the seminar seeking employment. The seminar was led by Sachin Dewan, Pol, Malvern Burnett and Dewan's agent, Salimon. They told the candidates that they would be working for a company called J & M Associates in either California or Mississippi. They told them they would receive their green cards within five months and all they had to do was pay 500,000 rupees for processing. Dewan demanded three separate installments -- each split three ways between Sachin Dewan, Global Resources and Malvern Burnett.

246.    George paid the first installment after the first seminar. He asked for a receipt and was told that the receipt would cost him an additional 5,000 rupees. George paid the additional cost to obtain proof of his payment. To pay this installment, George used his life savings of approximately 250,000 rupees, which he and his wife had been saving to build a home.

247.    After six months without an update from Dewan, George returned to Dubai to work until Dewan told him his green card was ready. While George was in Dubai, Dewan informed him about a second meeting at the Trident Hotel in Kochi. George sent his wife in his stead. There she paid the second installment. She also received a labor certification stating that George would be working for J & M Associates. To pay this installment, George sold family heirlooms such as gold jewelry.

44

248.   In or about October 2006, Dewan called George and told him to resign from his job in Dubai because he would be departing for the United States soon.  Taking Dewan at his word, George returned to Kerala, India.

249.   When George returned home, he waited another month with no word on when he would be traveling to the United States.  George then went to see Dewan's agent, Salimon.  Salimon informed George he would not receive a green card before traveling to the United States and he would not be working for J & M Associates.  Instead, Salimon told George he would receive an H-2B visa and work for Signal, a company George had never heard of up to that point.  George said he no longer wanted to go and wanted his money back.  Salimon told him he could not refund the first two installments and assured George he would eventually get a green card for himself and his family.  As George had already quit his job in Dubai and needed to resume earning money to support his family, he had no choice but to accept Salimon's offer.

250.   George then traveled to Chennai to take a trade test.  George was told to pay 150,000 rupees in additional fees for his plane ticket and for new processing fees because he would be working for Signal.  George did not have the additional funds and was forced to take out a high-interest loan to cover the costs.

251.   After paying the additional fee, George was told that he had to go to the U.S. consulate in Chennai for an interview.  Prior to the interview, he was instructed to go to the Park Hotel in Chennai to meet Sachin Dewan, Dewan's agent, Salimon, Malvern Burnett and Signal personnel.  There Sachin Dewan and Malvern Burnett instructed George not to discuss the payments he had made in connection with his visa.

252.   At the interview, George gave his passport to the consulate officer for visa processing.  He was told that the consulate would mail his passport back to his home.  He never

received it and was without his passport for a month.  George later learned that Malvern Burnett had collected all of the applicants' passports and given them to Sachin Dewan.

253.    In or about early November 2006, Dewan's Mumbai office called George and said he would be leaving for the United States the next day.  He was instructed to bring the third installment, an additional H-2B visa fee and the originals of any agreements or receipts he had received from Dewan Consultants.  To pay the third installment, George borrowed money at an interest rate of 8 percent, using written guarantees from Sachin Dewan, Global Resources and Malvern Burnett to enable him to borrow the money.

254.    At the office, Sachin Dewan and the others confiscated all of the agreements and receipts, explaining to George that he no longer needed the documentation because Signal would now process his green card.  When George demanded to keep the documents, Sachin Dewan said that he would not return George's passport unless he relinquished the documents.  George complied because he had no choice -- he was in significant debt and needed to earn a salary in the United States to pay off that debt and support his family.  George then signed several other papers he was not given time to read.  George immediately departed for the airport to catch his plane.

255.    George traveled to Mississippi on or about November 28, 2006.  At the Signal camp, George's housing unit was routinely searched by Signal personnel while the workers were sleeping.  In George's time with Signal, he never saw a guard find any prohibited items in his housing unit during such searches.

256.    George was friends with Sabulal Vijayan, who attempted suicide on March 9, 2007.  George left the camp in or about January 2008.

### Plaintiff Radhakrishnan Kakkathiruthi

257.    In or about late 2003, while working as a welder in Dubai and visiting his family in India, Kakkathiruthi first learned of the opportunity to work for J & M Associates in the United States through an advertisement in a local Indian newspaper, *Malayala Manorama*. The advertisement offered a permanent position and the opportunity to receive green cards for candidates and their families.

258.    In or about early 2004, Kakkathiruthi attended a seminar at the Trident Hilton Hotel in Kochi, India. Sachin Dewan, Dewan's agent, Salimon, Pol and Malvern Burnett were all present and spoke to the many candidates in attendance about the work with J & M Associates. They said that the process involved obtaining a labor certification followed by a green card, and would take a total of eighteen months. They said the job would be in a shipyard, earning $22 per hour, plus $27 per diem. Salimon explained that candidates would be required to make three installment payments totaling 600,000 rupees. Each of the three payments were to be made separately to Sachin Dewan, Global Resources and Malvern Burnett.

259.    The day after the seminar, Kakkathiruthi returned to the hotel and gave Salimon 10,000 rupees as a deposit to participate in the program. On or about March 5, 2004, Kakkathiruthi paid the remainder of the first installment, approximately 150,000 rupees. He paid $1,234 to each of Global Resources and Malvern Burnett, and an equivalent amount of 55,000 rupees in cash to Sachin Dewan. Kakkathiruthi then returned to work in Dubai.

260.    Approximately a year and a half later, in or about 2006, Kakkathiruthi returned to India. Unemployed, he waited to hear about the green card that had been promised by this time. Dewan sent Kakkathiruthi letters blaming the delays on problems in the United States.

261.     On or about March 7, 2006, Kakkathiruthi's labor certification was approved and he paid the second installment. He gave three payments to Dewan's agent, Salimon: $1,250 in demand drafts to each of Global Resources and Malvern Burnett, and an equivalent amount of 55,000 rupees in cash to Sachin Dewan.

262.     In or about late September or early October 2006, Kakkathiruthi contacted Dewan's agent, Salimon, to tell him of an opportunity he had to work as a welder in Kuwait for three months earning 225 dinars per month. Salimon told Kakkathiruthi not to take the job, explaining that there was now another opportunity to work for Signal in the United States with an H-2B visa. Salimon reassured Kakkathiruthi about the green card processing and that after the nine-month work visa, he would get a visa extension followed by the green card. Salimon said Kakkathiruthi would earn $18 per hour working for Signal and $27 per hour in overtime pay.

263.     Shortly after this discussion, in or about October 2006, Dewan's agent, Salimon, contacted Kakkathiruthi and told him he needed to come to Chennai to take a trade test for Signal. Kakkathiruthi took an overnight train to Chennai for the test. Several Signal personnel were present and discussed the type of work Kakkathiruthi would be doing. During this trip, Kakkathiruthi also met with Sachin Dewan and Salimon, who again confirmed the process for obtaining a green card in the United States: the H-2B visa would be extended twice, after which Kakkathiruthi would receive his green card.

264.     In or about mid-November 2006, Dewan's agent, Salimon, contacted Kakkathiruthi to tell him he passed the trade test and needed to return to Chennai for an interview with the U.S. consulate. Kakkathiruthi took another overnight train to Chennai. On the day before the interview, Kakkathiruthi and several other applicants met with Sachin Dewan,

48

Salimon and Malvern Burnett to prepare for the interview. They were told not to disclose the fees they had paid for the visa opportunity or their intention to seek a green card in the United States.

265.   In or about December 2006, Kakkathiruthi learned his visa had been approved. He traveled to Dewan Consultants' offices in Mumbai to pay the final installment, pick up his passport and plane ticket and leave for the United States. Kakkathiruthi departed for the United States on December 12, 2006.

266.   In total, Kakkathiruthi paid over $13,000 to Sachin Dewan, Global Resources and Malvern Burnett. To make these payments, Kakkathiruthi borrowed 300,000 rupees from money lenders at an interest rate of 4 percent per month. Kakkathiruthi also sold his wife's jewelry to collect another 75,000 rupees and borrowed 300,000 rupees from friends.

267.   At the Signal worksite in Mississippi, one of the Signal personnel was particularly abusive towards the Indian workers, shouting at them, cursing, and calling them names. When he approached, the Indian workers hid for fear that they would be subjected to one of his offensive rants.

268.   In Mississippi, Malvern Burnett charged Kakkathiruthi additional amounts for advice about his immigration status. Malvern Burnett later abandoned Kakkathiruthi's representation altogether, telling Kakkathiruthi that his engagement by Signal raised an irreconcilable conflict. As a result, Kakkathiruthi had to retain other counsel to continue his efforts to obtain the green card.

269.   Kakkathiruthi left the Mississippi camp in or about November 2007.

### Plaintiff John Abraham Kalampukatt

270.   In 2003, Kalampukatt saw an advertisement placed in a local Indian newspaper, *Malayala Manorama*. The advertisement offered "immediate openings" for

49

pipefitters in the United States, along with an "opportunity for permanent residency visa for an American company," a good salary and living accommodations.

271.    In 2004, Kalampukatt attended a meeting in Kochi, India at the Island Hotel.  Sachin Dewan and his agent, Salimon, led the seminar.  Sachin Dewan said his agency would take care of all the paperwork necessary for those at the meeting to go to the United States in eighteen to twenty-four months.  Sachin Dewan said the entire process would cost 550,000 rupees for each man at the meeting.  This fee would cover visa processing expenses.  Sachin Dewan also told those at the meeting that while they would receive a good salary and food and living accommodations in the United States; if they were not happy once they arrived, they would be able to find another place to work in the United States.  Kalampukatt believed and relied on the things he heard at this meeting.

272.    Kalampukatt made his payments in three installments.  Each installment included one payment to Malvern Burnett in a U.S. dollar draft, and a second payment in Indian currency of equivalent value to either Pol or Dewan's agent, Salimon.

273.    Kalampukatt's first installment of two payments of $1,262 was made on March 24, 2005.  The second installment of two payments of $1,250 was made on February 14, 2006.  The final installment of two payments of $1,460 was made on November 23, 2006.

274.    During the recruitment process, Kalampukatt worked for a Korean company in Kuwait.  He spent approximately 150,000 rupees traveling to and from India to complete medical and trade testing during the recruitment process, as well as to attend an interview at the U.S. consulate.

275.    Before he left Kuwait, Defendants told Kalampukatt he would be going to the United States on an H-2B visa rather than with a green card.  Kalampukatt said he would

prefer to keep his job in Kuwait and wait to go to the United States with a green card. Defendants told him this would be a mistake and he would have a greater chance of receiving a green card once he traveled to the United States.

276.   In September 2006, Kalampukatt learned he would be working for Signal in the United States. Once he learned a specific U.S. company was involved, he felt enough reassurance to take the opportunity to work in the United States with an H-2B visa. Kalampukatt then left his job in Kuwait and returned to India to prepare to leave for the United States.

277.   In total, Kalampukatt spent over 700,000 rupees during the recruitment process. He paid approximately 550,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett. He spent another 150,000 rupees traveling from Kuwait to India to complete the required paperwork and testing. To finance such payments, Kalampukatt emptied his savings and borrowed large sums of money from friends and family. Kalampukatt spent these amounts based on his belief that he would soon be working in the United States with a green card.

278.   In or about late 2006 or early 2007, while working at the camp in Mississippi, Kalampukatt witnessed a physical fight break out between two men in his housing unit after one man suspected the other of inappropriately watching him change clothes. Kalampukatt believes this incident was a direct result of the cramped space and lack of privacy in his housing unit.

279.   In early 2007, Kalampukatt's salary was unexpectedly reduced from $18.50 per hour to $15 per hour. Signal personnel threatened to deport Kalampukatt to India when he complained. The officials told Kalampukatt that his salary was reduced because Signal did not have a performance report for him. Kalampukatt, however, performed hydro-testing functions for which such reports were not available. On information and belief, and based on

conversations with Dewan's agent, Salimon, Kalampukatt believes his salary was reduced as a tactic to send him and other workers back to India so that J & M Associates could profit from recruiting new workers to fill their positions.

280.    In early March 2007, Kalampukatt attended a meeting at a local church. Kalampukatt was present on March 9, 2007, when Signal personnel locked up several workers. One of those workers, Sabulal Vijayan, had translated for other workers at the church meeting Kalampukatt attended days before and attempted suicide on March 9, 2007. After that incident, on March 12, 2007, Kalampukatt and three other workers escaped the camp around midnight by climbing the fence after Signal personnel returned to their quarters. The men arranged for a car to pick them up once they climbed the fence.

### Plaintiff Thomas Baby Madakkameprathu

281.    In early 2004, Madakkameprathu saw a newspaper advertisement for employment in the United States. The advertisement offered a green card, as well as the opportunity to bring family along to the United States.

282.    In or about February 2004, Madakkameprathu further learned of the opportunity to work in the United States from friends who attended a recruiting event in Kerala, India.

283.    In or about April 2004, Madakkameprathu attended a recruiting event in India led by Sachin Dewan and his agent, Salimon and Malvern Burnett. These men told Madakkameprathu he could reside and work in the United States with a green card, and that his family would be able to join him. Madakkameprathu was told that he would work in California for J & M Associates. He was told he would be able to come to the United States within eighteen months and the program would cost 585,000 rupees, payable in three installments of

page

65,000 rupees each to Sachin Dewan, Global Resources and Malvern Burnett.

Madakkameprathu did not understand parts of the presentation.

284.   In or about April 2004, Madakkameprathu paid the first installment of 65,000 rupees each to Sachin Dewan, Global Resources and Malvern Burnett.

285.   Following payment of the first installment, Madakkameprathu was told there was a delay in the program and that he would not be able to go to the United States until the next year.  In 2005, Madakkameprathu was told Hurricane Katrina was causing the delay. Signal and/or Dewan offered to refund part of the first installment, but indicated that another part of the first installment was not refundable.  Madakkameprathu did not want to lose part of the money he had already paid, so he decided to continue making the required installment payments.

286.   In or about February 2005, Madakkameprathu paid the second installment of 65,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett.

287.   In or about November 2006, Madakkameprathu paid the third installment of 65,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett.  Prior to making this third payment, Madakkameprathu learned he would be working for Signal in Mississippi instead of working for J & M Associates in California.

288.   In total, Madakkameprathu paid Sachin Dewan, Global Resources and Malvern Burnett 195,000 rupees each.  To make these payments Madakkameprathu sold gold, borrowed money from friends and family, took out bank loans and sold land.

289.   In or about October 2006, Madakkameprathu interviewed with the U.S. consulate in India.  Following the interview and while still at the consulate, Madakkameprathu was required to give his passport to Sachin Dewan for processing.  In or about November 2006, Madakkameprathu received his passport back after paying the third installment.

290.   In or about November 2006, Madakkameprathu traveled to Mississippi to work as a pipefitter for Signal during the night shift.  In or about March 2007, Madakkameprathu's salary was decreased from $18.50 per hour to $13 per hour. Madakkameprathu was told his salary was reduced for performance reasons, but he believed the real reason was that the pipefitting work was completed and Signal needed reasons to deport some of the workers to India.  Some workers that experienced similar salary reductions were able to negotiate a salary of $15 per hour and were allowed to re-take performance tests. Madakkameprathu does not believe any workers passed those re-examinations.

291.   At the Signal camp in Mississippi, on the morning of March 9, 2007, Madakkameprathu woke to a loud sound.  He saw Signal personnel, dressed in black and carrying guns, looking for certain workers.  Madakkameprathu saw the Signal personnel force certain workers into the camp "TV room."  After the workers were let out and told they were being deported, Madakkameprathu saw one worker with bloody wrists being taken out of the camp.  That worker was shouting "I cannot go back to India."

292.   In or about April 2007, Signal personnel gave Madakkameprathu and some other workers plane tickets back to India.  Signal personnel told these workers they would be able to come back to the United States in six months and obtain a green card. Madakkameprathu did not accept the offer and moved to South Carolina.

### Plaintiff Anthony Marian

293.   In or about April 2004, Marian attended a seminar conducted by Sachin Dewan, Pol and Malvern Burnett in Chennai.  During the seminar, Sachin Dewan stated that J & M Associates was recruiting people from India to work in the United States.  Sachin Dewan stated that candidates would receive green cards.  He told Marian that if he was interested in the job, he would need to pay a total of 600,000 rupees in three installments.  Each installment

would total $3,750: $1,250 each to Global Resources and Malvern Burnett, and the equivalent amount in rupees to Sachin Dewan.

294.    On or about April 30, 2004, Marian paid the first installment.

295.    In or about December 2005, Marian went to work in Russia. While Marian was working in Russia, Sachin Dewan called Marian and told him to return to India. Marian quit his job and returned to Chennai.

296.    In or about March 2006, Marian met with Dewan in Kochi, India. At this meeting, Marian received an approved labor certificate from Dewan. Marian then paid the second installment.

297.    In or about the first week of November 2006, Sachin Dewan told Marian that J & M Associates would continue to pursue Marian's application for a green card, but that in the meantime Marian should go to the United States to work for Signal. Marian then attended and passed a welding test Signal personnel conducted in Chennai.

298.    On or about November 24, 2006, Marian went to the U.S. consulate in Chennai for a visa interview. Before the interview, Sachin Dewan told Marian that he must not mention that he had paid money in connection with his visa processing, or else he would not receive the visa. Sachin Dewan also told Marian to pay the final installment of $3,750 to J & M Associates and to pick up his passport and plane ticket.

299.    In or about December 2006, Marian went to Sachin Dewan's office in Mumbai and paid the remaining installment. Marian then received his passport and plane ticket.

300.    On or about December 18, 2006, Marian traveled to Mississippi. Marian began working as a marine pipe welder and worked in unsafe conditions. The inside of the tank where Marian worked was often wet, exposing Marian to the risk of injury or death by electric

shock.  Whenever the Indian workers raised such safety concerns, Signal personnel would make the workers leave the job site and return to camp without pay for the hours they missed.

301.    At the Signal camp in Mississippi, the housing units were so cramped and uncomfortable, Marian slept on the benches in the camp cafeteria.

302.    In or about the last week of September 2007, Marian escaped the camp because he could not bear the harsh conditions any longer.  One of Marian's coworkers helped him escape by driving him away from the camp.  Marian left behind all his non-essential belongings because he feared that if Signal knew he was about to leave, it might try to lock him up and have him deported.  Marian remains afraid of Signal's retribution.

### Plaintiff Jacob Mathew

303.    In or about August 2004, Jacob Mathew was working as a pipefitter at a shipyard in Kerala, India when he saw an advertisement in a local Indian newspaper, *Malayala Manorama*.  The advertisement offered an opportunity to work in the United States permanently.

304.    In response, Jacob Mathew went to a meeting at a Mumbai hotel, where he met Sachin Dewan, Dewan's agent, Salimon, Pol and Malvern Burnett.  Sachin Dewan explained to him that they were recruiting for a position with a company called J & M Associates.  The work would be in a shipyard in California and Sachin Dewan described it as a wonderful opportunity.  He said Jacob Mathew could obtain a green card through the position, and that once he had his green card he would be able to bring his family to the United States as well.  Jacob Mathew was told that the job with J & M Associates would pay between $18 and $21 per hour and that he could make about $1,500 per week.  Sachin Dewan told Jacob Mathew that it would cost $12,000 to arrange for his emigration, a fee which he would need to pay in three installments of $4,000, each divided equally between Sachin Dewan, Global Resources and Malvern Burnett.

56

305.    Although he did not have the money they demanded, Jacob Mathew dreamed of moving his family to the United States and determined to raise the money.  He sold his wife's jewelry and used his mother's property as collateral to borrow approximately $8,000 from local loan sharks, called "money lenders" or "blade men."

306.    In connection with his first installment, Jacob Mathew was required to pass a trade test.  Once he paid his first installment, Jacob Mathew was told that they would begin the paperwork for him to obtain his green card.

307.    Approximately one year after he paid his first installment, Jacob Mathew paid his second $4,000 installment in three equal payments to Sachin Dewan, Global Resources and Malvern Burnett.

308.    After Jacob Mathew paid his second installment, a substantial amount of time passed without him hearing anything about the status of his green card or the job with J & M Associates.  When he eventually made contact with Sachin Dewan, Jacob Mathew was told that the opportunity to work for J & M Associates in California was no longer available, but that there was a new opportunity to work for Signal.  He was told that the Signal opportunity would cost $3,000 more, including $1,000 for a visa and $2,000 for a plane ticket.  Jacob Mathew felt he had no choice but to accept the opportunity because of the amount of debt he had incurred.  He was told that he would receive a H-2B visa, and was also assured that Signal would take over the process of obtaining his green card.

309.    In or about December 2006, Jacob Mathew traveled from Mumbai to Mississippi.

310.    Jacob Mathew left Signal in or about November 2007.  He still owes thousands of dollars that he borrowed to pay Sachin Dewan, Global Resources and Malvern Burnett.

### Plaintiff Shaju Olangattu Mathew

311.    In or about February 2005, while he had temporarily returned to India from his job in the country of Georgia, Shaju Mathew saw an advertisement placed by Dewan Consultants in a local newspaper.  The advertisement sought applications from welders, structural fitters, pipefitters, pipe fabricators and marine engine fitters and offered a green card for candidates and their families.

312.    On or about February 13, 2005, in response to this advertisement, Shaju Mathew attended a seminar led by Sachin Dewan, Pol and Malvern Burnett.  These men promised that the candidates would be "fast tracked" for green cards, which would only take nine months instead of four years.  The men guaranteed that the job would last two to three years and that Shaju Mathew could work for any company and permanently settle in the United States, along with his family.  Shaju Mathew was told that his spouse would be able to work in the United States.  The men said that the fee would be 500,000 rupees, to be paid in three installments.

313.    In response to a letter dated March 4, 2005 from Sachin Dewan, Shaju Mathew mailed Sachin Dewan copies of the documents required for his application, including his passport, birth certificate, trade certificates, photographs and biographical form.

314.    On or about March 23, 2005, Shaju Mathew signed a contract and paid Dewan 55,555.55 rupees in cash.  He did not receive a receipt.  In order to make this payment, Shaju Mathew had to sell a plot of land he had purchased using life savings he earned while

working in the United Arab Emirates.  He also had to borrow $4,000 from local loan sharks, called "blade men."

315.    Shaju Mathew decided not to renew his work visa in Georgia.  He pursued the opportunity in the United States so that he could have a stable life with his family there.  His past work experiences had entailed prolonged separation from his loved ones.

316.    On or about April 8, 2005, Shaju Mathew hand-delivered two checks, each in the amount of $1,266, to the offices of Global Resources and Malvern Burnett, each gave him receipts.

317.    In or about February 2006, in order to pay the second installment, Shaju Mathew borrowed $3,300 from his father-in-law and friend.  On or about February 15, 2006, he paid Dewan 55,555.55 rupees in cash and received no receipt.  He hand-delivered two checks, each in the amount of $1,250, to the offices of Global Resources and Malvern Burnett.  After making this second payment, Shaju Mathew signed an agreement saying his visa petition should be completed within six to eight months, though it might be delayed because of a backlog.

318.    On or about November 1, 2006, Sachin Dewan called Shaju Mathew and told him the green card process was delayed but continuing, and that Signal had an H-2B visa for him.  Shaju Mathew then went for an interview with Pol, Malvern Burnett, Dewan's agent, Salimon, and three Signal personnel.  These men gave him a written and practical trade test.

319.    In a letter dated November 14, 2006, Shaju Mathew was told that he passed the test and needed to pay the third installment.  To pay this installment, he sold his wife's jewelry for $3,000 and borrowed $3,000 from a "blade man."

320.    On or about November 27, 2006, Shaju Mathew paid Dewan 55,555.55 rupees in cash and received no receipt.  He delivered two checks, each in the amount of $1,460,

to Global Resources and Malvern Burnett. He was then told to pay additional fees for his plane ticket and an 800 rupee MRV visa fee -- expenses Shaju Mathew thought were already included in the $12,000 fee. He was also told to book an interview with the U.S. consulate.

321. On or about November 29, 2006, Shaju Mathew received a telephone call to appear at the consulate in Chennai for an interview. Sachin Dewan told Shaju Mathew to tell the consulate that he only paid $100 in connection with his visa. After the interview, Shaju Mathew was told that his passport with visa would be mailed to his home.

322. Shaju Mathew did not receive his passport at his home. Sachin Dewan called him and told him he had the passport and to pick it up along with his plane ticket at the office. Shaju Mathew does not know how Sachin Dewan obtained his passport.

323. On or about December 6, 2006, Shaju Mathew went to the office. He was told that his flight left that day and he did not have enough time to say goodbye to his family.

324. When Shaju Mathew arrived in Mississippi, the camp was surrounded by high fences, barbed wire and Signal personnel guarding the only gate.

325. In or about the end of October 2007, Shaju Mathew slipped on a wet deck between the housing units at the camp. He twisted his ankle and his doctor excused him from work until November 9, 2007. The medical insurance Signal provided did not cover Shaju Mathew's medical expenses. In or about December 2009, Shaju Mathew first learned of several outstanding medical bills in his name.

326. When Shaju Mathew left the Signal camp on or about November 12, 2007, he was unable to bring his personal items with him. He feared Signal would send police to deport him after he left.

60

### Plaintiff Davis Mathai Meledan

327.    In or about January 2004, Meledan saw a newspaper advertisement while working in Dubai.  The advertisement described an opportunity for work in the United States and the possibility of obtaining a green card.

328.    In or about March 2004, in response to the advertisement, Meledan attended an informational seminar in Dubai led by Sachin Dewan and Pol.  At this seminar, Sachin Dewan and Pol described an opportunity to work for a large company at a shipyard in California, and explained that a payment of approximately $12,000 to $15,000 was required in three installments.  The payments would coincide with the three steps of processing the green card applications.  Sachin Dewan and Pol said that they would handle the labor certification and green card application, and the process would take six to nine months.

329.    On April 15, 2004, Meledan paid a first installment of $4,500 in three demand drafts of $1,500 each to Sachin Dewan, Global Resources and Malvern Burnett.  The second installment was made in 2005.  In order to make these payments, Meledan borrowed money from his brother.

330.    In or about July 2006, Sachin Dewan and Pol explained that there was a delay with the original employment opportunity.  Meledan was told of an opportunity at Signal, and told it would be an expedited process.  Sachin Dewan and Pol said Meledan would receive an H-2B visa and his green card application would continue to be processed.

331.    Meledan was told that his two earlier installments were nonrefundable because the money had already been used for processing.  Meledan paid his third installment in or about October 2006.

332.    On or about October 31, 2006, Meledan arrived at the camp in Mississippi.  Approximately five months later, Meledan saw a doctor because he was suffering constant chest pains.  The doctor attributed Meledan's chest pains to the camp's unhealthy food.

333.    One day, Meledan saw the picture of a worker that had quit Signal posted on a board in camp.  Signal personnel told Meledan and other workers that the former worker would be reported to the police.  Meledan remained at the camp because he understood that if he attempted to leave and work elsewhere, he would be reported to the police.

334.    In or about February 2007, Meledan witnessed Signal personnel confronting outspoken workers and threatening to deport them to India.  Meledan believed that he would be deported to India if he left Signal.

### Plaintiff Jeegan Joseph Cheruthalakal Michael

335.    In or about February 2004, while working as a pipefitter at the Kochi Refinery in Kochi, India, Michael saw an advertisement for Dewan Consultants in a local Indian newspaper, *Malayala Manorama*.  The advertisement described work opportunities for pipefitters and other skilled workers in the United States, as well as the opportunity to get a green card.  The advertisement included the address for a seminar for interested candidates at the Trident Hilton Hotel in Kochi.  Michael called Dewan and spoke to Dewan's agent, Salimon.  Salimon told him that the immigration process would take between eighteen and twenty-four months and that once in the United States, Michael would be able to work for a "very good salary."

336.    Later in 2004, Michael attended the seminar at the Trident Hilton Hotel with approximately one hundred other candidates.  Sachin Dewan, Pol and Malvern Burnett were present and told the candidates that after an approximately two-year immigration process, the men and their families, if desired, would be prepared to travel to the United States with a green

card. Once in the United States, the candidates were told that they would work for J & M

Associates for a salary of $16 per hour for about sixty hours of work per week, plus $21 per

diem. The men were also told that in order to take advantage of this opportunity they would

have to pay, in installments, a total of about $14,000 each, as well as an additional $1,500 per

person for each additional family member they wished to bring along.

337.    Soon after the seminar in 2004, Michael paid the first installment using

money from the sale of his wife's gold jewelry and loans from local loan sharks, called the "blade

mafia," which he secured by putting up some of his wife's other gold jewelry as collateral.

Michael made the payment with a $1,250 check each to Global Resources and Malvern Burnett,

and 55,000 rupees in cash to Sachin Dewan. Michael checked on the progress of his application

every month after paying the first installment and was told that Hurricane Katrina had caused

delays in the process.

338.    In either 2005 or 2006, after Dewan Consultants' offices received

Michael's labor certificate, he was asked to pay the second installment. Michael again borrowed

money from the "blade mafia" and paid in the same manner as the first installment.

339.    In or about October 2006, Dewan informed Michael that the job

opportunity was no longer with J & M Associates, but now was an opportunity to work for

Signal. Michael was told that he would initially be processed with an H-2B visa, but he would

still have the opportunity to earn a green card while working for Signal. In order to work for

Signal, Michael had to take two trade tests, the second of which was in Chennai in front of

Signal personnel.

340.    On or about November 13, 2006, Michael went for an interview at the

U.S. consulate. Before interviewing at the consulate, Sachin Dewan instructed Michael not to

tell the consulate about the installment payments or the green card. After the interview, Michael returned to the hotel and met with Sachin Dewan and his agent, Salimon, again. Sachin Dewan told Michael that the consulate would be sending his passport directly to Dewan Consultants. Sachin Dewan and Salimon then told Michael to go home and promised to contact him when everything was ready for him to go to the United States.

341.    On or about November 26, 2006, Michael received a call from Dewan Consultants' offices in Mumbai. The caller said that Michael would be leaving Mumbai the next day to go the United States and that Michael should bring the third installment payment with him to Mumbai. Michael had to fly to Mumbai at his own expense of approximately 14,000 rupees.

342.    On or about November 27, 2006, Michael arrived in Mumbai and paid the third installment. Michael again took out loans to pay the installment. While in Mumbai, Sachin Dewan also collected all of Michael's original documents and required Michael to sign papers terminating his relationship with Dewan. Michael then departed for the United States.

343.    In total, Michael paid approximately $16,000 to Sachin Dewan, Global Resources and Malvern Burnett, including testing fees, airfare and immigration fees.

344.    At the Signal camp in Mississippi, a friend came to visit Michael, but Signal personnel would not let the visitor in or alert Michael that his visitor had arrived. Another friend informed Michael the visitor was there and Michael was only allowed to meet with the visitor in the parking lot outside the camp.

345.    Michael is a devout Catholic but did not feel free to practice his religion at the camp because Signal personnel insisted on taking the workers to a Pentecostal church.

## Plaintiff Gopalakrishnan Unniampathu Vettical Nair

346.    In late 2003, Gopalakrishnan Nair was living with his wife and two daughters in Abu Dhabi and was employed at a steel plant there. He was informed by friends in India about an advertisement Dewan Consultants placed in the *Times Of India* newspaper. The advertisement offered an opportunity for employment and permanent residency in the United States for candidates and their families. Gopalakrishnan Nair called the Dubai offices of Dewan Consultants and was told to attend a conference in Abu Dhabi.

347.    In or about January or February 2004, Gopalakrishnan Nair attended a group seminar at the Al Maha Hotel in Abu Dhabi. Sachin Dewan, Manesh Dewan, Pol and Malvern Burnett were all present at the seminar. They explained the process for obtaining a green card, that it would take eighteen to twenty-four months and that it would cost approximately $15,000, to be paid in three installments. The candidates were told that they could bring their families to the United States for an additional fee per family member. Sachin Dewan introduced Malvern Burnett as an attorney who would take care of all of the necessary immigration paperwork and other legal formalities. It was also explained that the job would be through J & M Associates, would be at a shipyard in California, and would pay $18 per hour for a minimum of forty hours per week, plus overtime. The candidates were provided with the website of the shipyard owner.

348.    After attending the seminar, Gopalakrishnan Nair collected the money he needed, traveled to Dewan Consultants' offices in Dubai and paid the first installment. He paid demand drafts in the amount of $1,222 each to Global Resources and Malvern Burnett and 4,500 dirham in cash to Sachin Dewan. Gopalakrishnan Nair was also given papers to sign, which he did because he was promised the green card that he sought.

65

349.    For almost two years, Gopalakrishnan Nair called Dewan Consultants' Dubai offices for updates.  In or about December 2005, he was asked for his second installment. In or about February 2006, after borrowing the money from friends, Gopalakrishnan Nair paid $1,222 each in demand drafts to Global Resources and Malvern Burnett and 4,500 dirham in cash to Sachin Dewan.  These payments were delivered to Dewan Consultants' offices in Dubai.

350.    In or about April 2006, Gopalakrishnan Nair was notified that he had to return to India for final processing and preparations to depart for the United States.  In May he gave resignation notice to his employer in Abu Dhabi, and he returned to Mumbai on or about June 15, 2006.  Gopalakrishnan Nair was unable to take a job in Mumbai because Dewan told him that he needed to be ready to depart for the United States.

351.    In or around October 2006, Gopalakrishnan Nair went to Dewan Consultants' offices and was told to pay his third installment.  Gopalakrishnan Nair told Sachin Dewan that he did not have the money to do so.  Sachin Dewan told Gopalakrishnan Nair that if he did not make the payment he would not be able to go to the United States.  Gopalakrishnan Nair borrowed $5,600 from money lenders and an additional $1,000 from his father-in-law.  In or about the first or second week of October 2006, Gopalakrishnan Nair paid $1,435 each in demand drafts to Global Resources and Malvern Burnett and the equivalent of $2,600 cash, in rupees, to Sachin Dewan.

352.    At this time, Gopalakrishnan Nair was told that the job opportunity being offered was at Signal, not the California shipyard originally identified at the seminar in Abu Dhabi.  He was also told that he could go to the United States to work for Signal on an H-2B visa and not a green card.  When Gopalakrishnan Nair stated that he did not want to go to the United States on a temporary basis, Sachin Dewan told him that the green card he had been promised

would take a very long time and, for the first time, said that Gopalakrishnan Nair might not receive it at all. Sachin Dewan promised that Signal would extend the H-2B visa and by the time those visas expired, Signal would likely sponsor a green card application for Gopalakrishnan Nair. Sachin Dewan pointed out that Malvern Burnett was also the attorney involved in the Signal opportunity. Sachin Dewan also threatened that if Gopalakrishnan Nair did not pay the third installment and take the Signal opportunity, he had many other potential applicants who would.

353.   Faced with the threat of losing the money he had already paid (which he had borrowed from friends, family and moneylenders), and losing the opportunity for a job in the United States after having given up a good job in Abu Dhabi at Sachin Dewan's behest, Gopalakrishnan Nair had no option but to pay the third installment for the Signal opportunity and its temporary visa. Gopalakrishnan Nair's family and others from whom he had borrowed money were relying on him. He had no choice but to take the word of Sachin Dewan and others who recruited him.

354.   At this time, Gopalakrishnan Nair signed additional papers in Sachin Dewan's office. He was forced to do so under hurried and chaotic circumstances in which it was difficult to find an unoccupied flat surface on which to sign the papers, much less read and understand them. Because he had already been required to pay so much money, Gopalakrishnan Nair had no choice but to sign the papers. At this time, Sachin Dewan and his agents also demanded that Gopalakrishnan Nair return the agreements he had signed earlier.

355.   On or around October 15, 2006, Gopalakrishnan Nair attended an interview at the U.S. consulate in Mumbai. Dewan had called him about the interview and before the interview, Gopalakrishnan Nair went to Sachin Dewan's offices. There, Sachin

Dewan instructed Gopalakrishnan Nair not to mention anything at the consulate about his payments to Sachin Dewan and that, if Gopalakrishnan Nair did, he would be denied a visa.

356.   After the interview, Gopalakrishnan Nair's passport and visa was sent to Dewan, and was not returned until Gopalakrishnan Nair made an additional payment to Sachin Dewan, the equivalent of $868 cash, in rupees, for his plane ticket to the United States.

357.   In total, Gopalakrishnan Nair paid over $13,500 to Sachin Dewan, Global Resources and Malvern Burnett and incurred travel and many other expenses.  To finance these payments, Gopalakrishnan Nair borrowed large sums of money and paid significant interest.

358.   At the Signal camp in Mississippi, Gopalakrishnan Nair was forced to work under unsafe conditions in part because of the pace at which his team was demanded to work.  That pace required them to perform several tasks in confined spaces simultaneously, instead of consecutively, which would have been safer.

359.   At work, Gopalakrishnan Nair was treated differently than non-Indian workers.  Indian workers were consistently asked where they were going, and why, while non-Indian workers would come and go without being bothered.  Gopalakrishnan Nair also observed Indian workers being punished with disproportionate harshness for small mistakes, including being verbally abused in front of others so that Signal personnel could make an example of them.

360.   In his housing unit, Gopalakrishnan Nair slept on a top bunk right below a light which had to be switched on and off constantly in order for other workers to come and go or use the bathroom.  As a result, sleep deprivation was a serious and persistent problem for him at the camp.

361.   Gopalakrishnan Nair is a vegetarian and, in addition to the poor quality of the food, there was often only one vegetarian option available.  In order to adhere to his

vegetarian diet, Gopalakrishnan Nair had to subsist on crackers and energy drinks that he was able to purchase for himself. Despite how bad this was for his health, he had no choice. When Gopalakrishnan Nair and other vegetarians asked to live elsewhere, Signal personnel told them it was not permitted because of the money Signal had spent to build the housing at the camp.

362.     Gopalakrishnan Nair was repeatedly threatened with being sent back to India. He was told by Signal personnel and Malvern Burnett that if he created any problems or performed poorly, he would be sent back. These threats became even more frightening after he heard screaming and saw the blood of a fellow worker who attempted suicide after being rounded up to be sent back to India. After this incident, Gopalakrishnan Nair confronted Sachin Dewan and Malvern Burnett about the conditions at the camp, but was told not to create any more problems and that Signal knew who was causing the trouble.

363.     Gopalakrishnan Nair left Signal in February 2008. Gopalakrishnan Nair still owes thousands of dollars that he borrowed to pay Sachin Dewan, Global Resources and Malvern Burnett.

### *Plaintiff Prakash Kuttiyil Chandrasekharan Nair*

364.     In or about December 2004, while Prakash Nair was working at a shipyard in India, he saw an advertisement in a newspaper offering the opportunity to work in the United States permanently with a green card.

365.     After seeing the advertisement, Prakash Nair called Dewan Consultants and spoke to Dewan's agent, Salimon. Salimon told Prakash Nair to attend a seminar at a Hilton Hotel. At the seminar, Prakash Nair met Pol and Malvern Burnett. They explained that they were recruiting for J & M Associates for an opportunity to work at a shipyard in California and receive a salary of approximately $14 per hour and $1,300 per week. They asked Prakash Nair to provide information regarding his background and described the process of obtaining a green

card. They told Prakash Nair he would need to pay approximately $18,000 to obtain the job, emigrate to the United States, and obtain his green card. He was assured that he would be given his money back if for any reason he did not receive a green card.

366.   Despite the high cost, Prakash Nair decided to pursue the job with J & M Associates based on the opportunity to obtain a green card and bring his family to the United States. Prakash Nair was required to pass a trade test to demonstrate he was qualified for the job and was given a schedule for three installment payments. The first installment was described as an "advance fee" or "processing fee" and was approximately $3,000. Prakash Nair did not have enough money for the payment, so he borrowed money from friends.

367.   After approximately six to seven months, Prakash Nair received a call saying that his labor certification was ready and that he needed to pay his second installment. Before paying, in an attempt to verify that the opportunity was real, Prakash Nair searched online for the name of the shipyard in California. After verifying that the company existed, Prakash Nair paid the second installment. To make the payment, Prakash Nair sold land and took out a loan from local loan sharks, called "blade men."

368.   After paying the second installment, there was a substantial delay during which Prakash Nair received no information regarding the status of his green card and his emigration to the United States. In or around December 2006, Prakash Nair saw another advertisement placed by Dewan Consultants. Prakash Nair went to the seminar referenced in the advertisement, and Sachin Dewan, Pol and Malvern Burnett were all at the seminar. Prakash Nair asked them about the status of his green card, and they informed him that there was no longer an opportunity to work at the shipyard in California, but that there was a new opportunity to work for Signal. He would need to pay the third installment plus approximately $1,200 more.

Prakash Nair was told that he would obtain a travel visa through Signal, and that Signal would take over the process of obtaining his green card. Prakash Nair feared losing the two installments already paid because he had no means of repaying the loans he had taken out. Under these circumstances, Prakash Nair agreed to made the additional payment and take the opportunity with Signal. He took and passed another trade test required by Signal and then signed an agreement with Signal.

369. On or about December 5, 2006, Prakash Nair visited Sachin Dewan at his offices and was told that his trip to the United States would be the next day. Sachin Dewan told Prakash Nair to bring all his documents with him. On or about December 6, 2006, Prakash Nair traveled to Mississippi.

370. At the Signal worksite in Mississippi, Prakash Nair was treated differently than the non-Indian workers, who were not required to live in the camp and were given easier jobs. Prakash Nair also experienced harassment by supervising Signal personnel. While being forced to work in unsanitary and unsafe conditions, he was repeatedly threatened that if he did not perform well that he would be fired and deported.

### *Plaintiff Francis Kottackal Ouseph*

371. Ouseph saw an advertisement in Malayalam newspapers announcing job opportunities in the United States, by which the candidates would receive a green card for themselves and their families.

372. Ouseph went to a hotel on April 4, 2004, where he was interviewed by Sachin Dewan and Pol, with translation provided by Dewan's agent, Salimon. Ouseph was told that if he paid a total of 600,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett, he would obtain a job and a green card in the United States.

71

373.     After Ouseph began making payments, he learned that he would be working for Signal in the United States. Instead of obtaining a green card, he was told that he would now go to the United States on an H-2B visa and his green card application would be processed when he arrived in the United States. Ouseph was required to pay 30,000 extra rupees to Sachin Dewan, Global Resources and Malvern Burnett because of this change.

374.     Ouseph then attended an interview at the U.S. consulate in Chennai. Before that interview, Ouseph was told that if asked, he should lie and say that he had only paid 35,000 rupees in connection with processing his visa. After that interview, Ouseph's passport was returned to Dewan and Global Resources rather than to Ouseph.

375.     Ouseph later attended a meeting in Mumbai with hundreds of other men. At this meeting, he made his final payment to Sachin Dewan, Global Resources and Malvern Burnett. His passport was then returned to him. He was required to sign documents that he did not understand, including one that said he only paid 35,000 rupees total in connection with processing his visa.

376.     In total, Ouseph paid 630,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett. Ouseph had to take out 600,000 rupees in loans to pay this amount. The loans included a bank loan with a 12 percent interest rate and a loan from a government cooperative with a 16 percent interest rate. Ouseph also sold his wife's gold ornaments to pay the fees.

377.     In Mississippi, Ouseph worked for Signal on oil rigs. Signal personnel pushed him to work very quickly and threatened to send him back to India. Signal personnel did not always give Ouseph time to put on his safety equipment properly.

378.     On the rigs, Ouseph and fellow Indian workers had to do dangerous work -
- such as work in oily or greasy areas where it was easy to fall -- and work with the heaviest
plates.  Ouseph suffered a knee injury after a fall caused by the dangerous conditions and spent
approximately $300 on medical expenses for the treatment of the injury.  Other men Ouseph
worked with suffered similar injuries.  Two men fell into the sea from the rigs.

### Plaintiff Purayil Arjunan Padinhare

379.     In or about December 2004, while working as a welder in Kuwait and
home on vacation in India, Padinhare saw an advertisement in a local Indian newspaper,
*Malayala Manorama*.  The advertisement offered employment for welders in the United States,
as well as assistance in obtaining a green card.  It instructed interested candidates to respond by
attending a seminar at a hotel in Kochi, India.

380.     In or about April 2005, Padinhare attended the seminar, along with
approximately 350 other candidates.  At the seminar, Sachin Dewan told Padinhare and others
that they would have an opportunity to work for J & M Associates and that they would obtain
green cards after working there for two years.  Sachin Dewan told Padinhare and others that they
would need to pay fees and take a trade test.  Padinhare paid 4,000 rupees and took the required
test.  In addition, Padinhare paid 2,000 rupees to take a medical exam, which Sachin Dewan
required.  Padinhare received a phone call a short time later informing him that he had passed the
test and medical exam, and could apply if he paid additional fees to Sachin Dewan, Global
Resources and Malvern Burnett, in three installments each.  Padinhare then paid the first
installment, paying $1,258 each to Global Resources and Malvern Burnett by a demand draft and
50,000 rupees in cash to Sachin Dewan.  To make the payment, Padinhare borrowed 200,000
rupees from a bank.

381.    In or about February 2006, Sachin Dewan called Padinhare to inform him that his labor certificate was ready.  Padinhare again traveled to Kochi, where Malvern Burnett confirmed that Padinhare would be able to obtain a green card after working for J & M Associates in the United States for two years.  Padinhare then paid a second installment of $1,250 each to Global Resources and Malvern Burnett by a demand draft and 50,000 rupees in cash to Sachin Dewan.

382.    In or about October 2006, Padinhare contacted Dewan to inquire about the status of his application.  He was informed that he could go to work for Signal immediately on the same terms that had previously been arranged with J & M Associates.  Padinhare resigned from his job in Kuwait and again traveled to India.

383.    In or about November 2006, Padinhare met with Sachin Dewan and others in Chennai.  Sachin Dewan stated that workers who had originally arranged to work for J & M Associates could work for Signal instead, for the same pay, and that workers choosing to do so would receive green cards after working in the United States for two years.  Sachin Dewan stated that in order to work for Signal, workers would need to pay an additional 2,000 rupees to take an additional trade test administered by Signal personnel.  Sachin Dewan stated that all fees would be refunded to any workers who did not receive a green card within two years, but that the first two installment payments would not be refunded in the event that the third payment was not made.  Padinhare took the trade test and then travelled to Mumbai.  Dewan's agent, Salimon, collected Padinhare's passport and arranged for his interview at the U.S. consulate three to four days later.

384.    After Padinhare completed the interview, the consulate kept his passport.  A few days later, Padinhare was told his visa and plane ticket were ready to be picked up from

Dewan Consultants and he was required to pay the third installment. Padinhare paid a third installment of $1,460 each to Global Resources and Malvern Burnett by a demand draft and paid cash to Sachin Dewan. To make the payment, Padinhare borrowed money from a bank.

385.   In total, Padinhare paid over $12,000 to Sachin Dewan, Global Resources and Malvern Burnett. Padinhare spent another $2,000 for required tests and travel. To finance these payments, Padinhare spent his savings and borrowed 600,000 rupees from several banks and individuals, at high interest rates.

386.   At the Signal camp in Mississippi, when Padinhare complained that the food served was spoiled and that he could not eat it, Signal personnel told him that it was better than the food in India. Padinhare understood this statement as both a dismissal of his concerns and a cultural insult.

387.   At work, Signal personnel would incentivize the Indian workers by punishing them severely -- forcing them to take unpaid leave for three days -- for minor transgressions. Padinhare believed this was because Signal personnel wanted to maximize the Indian workers' productivity and knew they needed to repay debts so badly they would be afraid of the punishment. Padinhare was punished this way on two occasions, in one instance for sitting down while on a break.

388.   In or about March 2008, Padinhare left the camp.

### Plaintiff Sudheeran Panayamthatta

389.   In or about November 2005, while working in Saudi Arabia, Panayamthatta's coworkers told him about an opportunity to work in the United States for Signal and obtain a green card for himself and his family. These coworkers had applied for the opportunity and were working in Saudi Arabia while they awaited their visas. The workers recommended that Panayamthatta contact Sachin Dewan.

75

390.   In or about November 2005, Panayamthatta contacted Sachin Dewan and his agent, Salimon.  Sachin Dewan and Salimon told Panayamthatta that the deadline to apply had passed, but because some people had cancelled before paying the second installment, Panayamthatta could take their place if he paid both the first and second installments at the same time, as well as an extra 25,000 rupees.  They also told Panayamthatta they would assist him in obtaining his green card and bringing his family to the United States.

391.   Shortly thereafter, in or about November 2005, at Panayamthatta's direction, Panayamthatta's brother met Sachin Dewan in his offices to deliver one payment totaling 395,000 rupees -- to cover the first and second installments and the additional 25,000 rupees -- on behalf of Panayamthatta.  This payment consisted of three demand drafts made out to Sachin Dewan, Global Resources and Malvern Burnett.

392.   In or about August 2006, Panayamthatta resigned from his job of eleven years as a foreman in Saudi Arabia and returned to India to meet with Sachin Dewan in order to pursue the opportunity in the United States.

393.   In or about September 2006, Panayamthatta and Rajesh Chandrasekharan met with Sachin Dewan in his Kerala offices.  Sachin Dewan told Panayamthatta that he would help him get a green card.  Dewan's agent, Salimon, also told Panayamthatta that he could apply for green cards for Panayamthatta's whole family right away in exchange for an additional fee for each family member.  Salimon explained that, alternatively, Panayamthatta's family would be able to join him in the United States within two years.

394.   In or about November 2006, Panayamthatta was called in to Sachin Dewan's offices to take a trade test and attend a meeting with Sachin Dewan, Malvern Burnett, Signal personnel and hundreds of other applicants.  At that meeting, Panayamthatta and the other

recruits were told they had two choices.  First, they could go to the United States immediately to work for Signal on an H-2B visa.  That visa would last for seven months and would be extended twice.  Signal would process the applicants' green card applications during the second extension period.  Alternatively, they could wait and go to the United States later with J & M Associates. Panayamthatta chose to work for Signal because he saw how long other people were waiting to work for J & M Associates and a loan he had taken out to make the initial payment was already accruing interest.

395.   On or about November 8, 2006, Panayamthatta appeared for an interview at the U.S. consulate.  Sachin Dewan told Panayamthatta to tell the consulate, if asked, that he only paid $1,000 in connection with his visa processing.

396.   On or about December 5, 2006, Panayamthatta went to Sachin Dewan's office.  Because the consulate had mailed Panayamthatta's passport to the office, Sachin Dewan had possession of Panayamthatta's passport.  Sachin Dewan required Panayamthatta to make the third installment and sign several documents before he would return the passport.  Panayamthatta paid Sachin Dewan the remaining balance of 200,000 rupees in cash and signed the papers.  The papers Panayamthatta signed were in English and he was not given time to read or understand them while standing in a line of 200 to 300 other people.  Panayamthatta felt that he had no choice but to pay and sign in order to get his passport back.

397.   Altogether, Panayamthatta paid approximately 395,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett and another 200,000 rupees to Sachin Dewan.  In order to make these payments, he borrowed 200,000 rupees from a bank at a 13.25 percent interest rate.  Panayamthatta borrowed the rest of the money from friends and relatives.

77

398.    Upon his arrival at the Signal camp on or about December 13, 2006, Panayamthatta began working about seventy hours per week doing oil rig maintenance and fitting.  Panayamthatta worked in what he felt were unsafe conditions on the rig -- in significant smoke and dust with no ventilation.  Although Indian workers complained to Signal personnel about the dangerous working conditions, Signal personnel ignored their concerns and instead made the Indian workers work more, sending away those that Signal personnel alleged were underperforming.

399.    After working at Signal for approximately two months, Panayamthatta noticed that other Indian workers who had arrived earlier than he had still had not received their promised green cards.  Panayamthatta asked Signal personnel about processing his green card and was told that they would begin that processing.

400.    In or about early 2007, after workers began complaining about the living and working conditions at Signal, Panayamthatta observed that Indian workers who asked about green cards were threatened with deportation, and he feared that this could happen to him as well.  Panayamthatta knew that he would be unable to pay his loans if he was deported so he continued to work for Signal until on or about November 27, 2007.

### Plaintiff Telson Joseph Pazhampilly

401.    In or about late 2003 or early 2004, Pazhampilly saw an advertisement in a newspaper, *Malayala Manorama*.  The advertisement said there was an opportunity for people with two years of pipe-fitting or welding experience to work in the United States and obtain green cards for themselves and their families.  The advertisement stated that candidates would be paid $21 per hour.

402.    In or about 2004, prompted by the advertisement, Pazhampilly attended a seminar at a hotel in Kerala, India.  The seminar was led by Sachin Dewan and Pol, with

translation by Dewan's agent, Salimon. These men explained that Pazhampilly would have to pay 500,000 rupees for paperwork and processing, and told him that he would be getting a green card and a salary of $18 per hour plus per diem, for a total of approximately $21 per hour.

403.    Pazhampilly paid a total of approximately 600,000 rupees to Sachin Dewan, Global Resources and Malvern Burnett during the recruitment period. To finance his three installment payments, Pazhampilly sold personal items and took out a series of loans. For the first installment, he borrowed 155,000 rupees from a friend, at 10 percent interest. For the second installment, he borrowed another 155,000 rupees, at 10 percent interest, from a bank. He put some of his wife's gold jewelry up as collateral for this loan. He sold additional jewelry for approximately 55,000 rupees. He also borrowed approximately 15,000 to 20,000 rupees from his brother, at no interest. For the third installment, he mortgaged his house and land for a 210,000-rupee loan from a bank, at 12 percent interest.

404.    For nearly two years after Pazhampilly attended the seminar and paid the first two installments, the opportunity to work in the United States did not arise. During this time, the tension and stress from his loans caused Pazhampilly to require medication for high blood pressure. Pazhampilly had never previously had problems with his blood pressure. During this time, Sachin Dewan and his agent, Salimon, continued to assure Pazhampilly that everything was still in process.

405.    In late 2006, Salimon called Pazhampilly to say there was a new opportunity, with immediate availability, to go to the United States on an H-2B visa to work for Signal. Dewan told Pazhampilly that Signal would provide room and board free of charge, and that he would have the opportunity to work overtime.

406.   Prior to Pazhampilly's interview at the U.S. consulate during the H-2B visa process, Sachin Dewan told Pazhampilly to lie about the amount of money he paid in connection with his visa processing. Pazhampilly was instructed to say, if asked, that he had paid only 5,000 rupees. He was also asked to sign a document indicating that Dewan and Global Resources had not collected any money from him. At this time, Pazhampilly thought that he was being cheated, but he felt coerced to sign the document because there were strong men with Sachin Dewan. Pazhampilly believed that if he refused to sign, he would be beaten. The documents that Pazhampilly signed were in English, and he was not given time to attempt to read them.

407.   Sachin Dewan was in possession of Pazhampilly's passport after the consulate interview. Sachin Dewan did not return the passport to Pazhampilly until after Pazhampilly paid the final installment.

408.   In Mississippi, Signal personnel routinely threatened to send Indian workers back to India. Pazhampilly was afraid to go back to India because his loans were so large, and he would have no way of paying them if he was in India.

409.   Pazhampilly saw rats in his housing unit in the camp.

410.   While Pazhampilly was working at Signal, he asked about the status of his green card application. He was told that if he did his work well, Signal would get him a green card. At one point, Sachin Dewan came to the camp and said the same thing.

### Plaintiff Sreekumar Janardhanan Pillai

411.   In or about December 2003, Pillai was working as a welder in Dubai when he saw an advertisement Dewan Consultants placed in *Gulf News* offering the opportunity to immigrate to the United States with a green card, a job guarantee for two to three years with pay

from $4,000 to $5,000 per month and permanent lifetime settlement in the United States for the candidate and family.

412.   In or about December 2003, Pillai called Dewan and spoke with Sachin Dewan, Manesh Dewan and Varuna Dewan.  He was told that the process of immigrating to the United States would take eighteen months and he would receive a labor certification, then an I-140, then a work permit, and finally a green card.  He was interviewed over the phone and told he would work for J & M Associates for a salary of $20 per hour.  Sachin Dewan told Pillai that the total cost would be approximately $14,294.

413.   On or about January 7, 2004, Pillai paid Manesh Dewan the first installment of approximately $3,676 in cash.

414.   On or about February 18, 2006, Pillai paid a second installment of approximately $3,676 in three equal payments of $1,225 to each of Sachin Dewan, Global Resources and Malvern Burnett.

415.   To make the payments, Pillai took out a loan at 11 percent interest from local loan sharks, called "blade men," and used family jewelry as collateral.  In or about 2008, Pillai defaulted on the loan, and the "blade men" took the jewelry and threatened his and his family's lives and property in an altercation.  Pillai's father subsequently suffered a heart attack.

416.   In or about December 2006, Sachin Dewan told Pillai that the opportunity to work for J & M Associates was no longer available and that Pillai should accept a new opportunity with Signal.  The new opportunity would cost an additional $1,000.  Pillai refused and demanded a refund of his payments.  Sachin Dewan refused to return any money and threatened that Pillai would lose all of his money if he did not accept the opportunity with Signal. Sachin Dewan gave Pillai one hour to decide.  In addition to losing the two installments already

paid, Pillai feared for his life and the lives of his family if he could not get a job in the United States and pay the "blade men." He agreed to take the opportunity with Signal under these circumstances.

417.   In or about 2006, Sachin Dewan instructed Pillai to go to Chennai to take a test. Pillai and many other applicants attended the test, and Sachin Dewan, Pol and four Signal personnel were present. Sachin Dewan publicly promised that Signal would obtain green cards for the applicants, but said the applicants would travel to the United States with H-2B visas. This was the first time Pillai was told he would be receiving anything other than a green card. Sachin Dewan also instructed the applicants to lie to the U.S. consulate at their interviews by saying they only paid $750 for a travel visa and intended to return to India on July 31, 2007. Pillai paid approximately $113 for his consulate interview.

418.   In or about December 2006, on the day before he was scheduled to fly to the United States, Pillai met Sachin Dewan at his office in Mumbai. At that time, Pillai paid the final installment of approximately $7,037 to Sachin Dewan, Global Resources and Malvern Burnett. Sachin Dewan instructed Pillai to sign documents in English that he could not read. Sachin Dewan did not allow Pillai enough time to translate them, or even ask questions about them. Pillai felt trapped and intimidated and that he had no choice but to sign the documents.

419.   In or about December 2006, Pillai traveled to Mississippi. At work, Pillai was harassed by Signal personnel and observed other Indian workers being harassed and suspended from work for making small mistakes. Non-Indian workers were not suspended for such mistakes.

420.    Pillai's religious beliefs prohibit the consumption of beef or pork.  Pillai could not eat the food provided at the camp without violating those beliefs on days where beef or pork were served because he was not provided any alternatives.

421.    Pillai observed unsanitary conditions in the camp kitchen.  Meat was unrefrigerated and cooked without being washed.  Pillai saw vermin and insects in the kitchen, which got into the food as it was being prepared.

### Plaintiff Pradeep Chembil Raman

422.    In or about March 2004, Raman was working in Dubai and saw a newspaper advertisement offering an opportunity to work in the United States and obtain a green card.  Raman contacted the telephone number listed on the advertisement and arranged a meeting with Sachin Dewan, Pol and Malvern Burnett.

423.    In or about April 2004, Raman met with Sachin Dewan, Pol and Malvern Burnett.  These men told Raman he could work in California and that he would receive a green card after working for two years.  They also told Raman that the fee would be $11,250, payable in three installments to Sachin Dewan, Global Resources and Malvern Burnett.

424.    In or about April 2004, Raman paid the first installment of $1,224 each to Sachin Dewan, Global Resources and Malvern Burnett.

425.    In or about June 2005, Raman paid the second installment of $1,224 each to Sachin Dewan, Global Resources and Malvern Burnett.

426.    In or about November 2006, Raman paid the third installment of $1,250 each to Sachin Dewan, Global Resources and Malvern Burnett.

427.    In late 2006, Sachin Dewan told Raman that he was required to pay an additional fee of $3,000 for an H-2B visa.  Raman did not understand why he was required to

pay the additional fee, but he paid another $3,000 to Sachin Dewan because he could not afford to lose the money he had already paid.

428.     In order to pay the fees described above, Raman used all of his savings and incurred bank debt.

429.     In or about November or December 2006, Raman interviewed with the U.S. consulate in Chennai.  Prior to the interview, Sachin Dewan instructed Raman not to tell the consulate the fee amount he had paid in connection with processing his visa.

430.     In or about December 2006, Raman traveled to the United States and began work as a welder for Signal in Mississippi.

431.     In the United States, Raman asked Sachin Dewan for a refund of his payments.  Sachin Dewan refused to refund any money.  Raman also asked to live outside the Signal camp, but Signal personnel told him this was not allowed.

432.     At the camp, Raman saw Signal personnel write down the names of the workers that complained at camp meetings.  Such workers were often punished arbitrarily.

433.     Signal personnel also threatened to send any workers back to India if they corresponded with public interest groups.  Raman had to sneak out of the camp at night to meet at a nearby church with a lawyer and others he believed could help him improve his condition. Raman was fearful at all times of being deported back to India, and he believed that if was caught sneaking out of (or back into) the camp, Signal would forcibly deport him.

434.     After he observed Signal personnel carrying a worker that attempted suicide on March 9, 2007, Raman heard that an outspoken worker's bank account had been frozen without any legitimate reason.  Raman believed that this would happen to him as well if he complained about conditions at work or in the camp.

*Plaintiff Shawkat Ali Shaikh*

435.   On or about March 2004, Shaikh was working as a welder in Abu Dhabi when he saw an advertisement placed in *Gulf News.* The advertisement offered jobs to welders in the United States, along with "[p]ermanent lifetime settlement in the USA for self and family." Shaikh called the phone number on the advertisement, expressed his interest and was told to attend a group seminar in Abu Dhabi.

436.   In or about March 2004, Shaikh attended the group seminar in an Abu Dhabi hotel. Sachin Dewan, Manesh Dewan and Pol were all present at the seminar. Sachin Dewan did most of the speaking and explained the process for obtaining a green card and working for a company in California. According to Sachin Dewan, the entire process would take eighteen to twenty-four months and would cost approximately $12,250. The job was to pay at least $14 per hour with an additional $6 per hour to cover living expenses. It was emphasized that the candidates could bring their families with them to the United States. Sachin Dewan explained that the payments were to be made in three installments. The first installment of $3,675 was due immediately. The second installment was due once the labor certification was processed. The final installment would become due once the green card was ready to issue. Each payment was to be split three ways between Sachin Dewan, Global Resources and Malvern Burnett. Payments to Sachin Dewan were to be made in cash, and payments to Global Resources and Malvern Burnett were to be made in U.S. dollar drafts.

437.   On or about April 9, 2004, Shaikh paid the first installment. He was also required to sign some papers in English that he did not understand.

438.   For nearly two years thereafter, Shaikh received no communications from Sachin Dewan or others, despite his constant international calls from Abu Dhabi to Dewan Consultants' offices in India. Shaikh estimates he spent $3,000 on such international phone calls.

439.    On or about March 11, 2006 -- nearly two years after Shaikh paid the first installment -- he received a phone call from Sachin Dewan informing him that his I-140 labor certification processing was completed. He was told that the second installment of $3,675 was due. Shaikh traveled with a friend to Dewan Consultants' offices in Dubai to make the payments.

440.    In or about October 2006, Shaikh quit his job in Abu Dhabi and returned to India because Sachin Dewan told him he would soon leave for the United States.

441.    In or about late October 2006, Sachin Dewan told Shaikh to attend a welding test in Chennai. About thirty minutes before the test was scheduled to begin, Sachin Dewan first told Shaikh and the other applicants in attendance that they would not be working in California for J & M Associates, but would instead be working for Signal. He said the applicants would earn $18 per hour and would receive free room and board from Signal. Signal personnel then said they would handle the applicants' green card applications. In the meantime, the applicants would come to the United States with H-2B visas. Sachin Dewan explained that, because of the change in plans, the final installment payment would be more than the previous payments: 135,000 rupees in cash to Sachin Dewan and $1,460 to each of Global Resources and Malvern Burnett. Sachin Dewan promised to return all of Shaikh's payments if neither Signal nor J & M Associates succeeded in obtaining a green card for him.

442.    On or about December 2006, Shaikh went to Delhi to attend an H-2B visa interview at the U.S. consulate. Prior to the interview, Shaikh and other candidates were warned that if they told the truth about how much money they paid in connection with their visa processing, they would not receive a visa and would not be reimbursed for any of the money they spent. At the end of his interview, Shaikh received a receipt for his passport and was instructed

to pick it up with his visa soon thereafter.  Shaikh went to pick up his passport and, upon receiving it, Sachin Dewan demanded that he hand the passport over, explaining that the passport was necessary for Sachin Dewan to purchase the plane tickets.

443.    Sachin Dewan refused to return the passport until Shaikh paid the final installment payment.  On or about January 20, 2007, upon payment of the full amount demanded, Sachin Dewan still refused to return Shaikh's passport until he returned all of the receipts and paperwork he had received from Sachin Dewan and others during the application process.  Shaikh said his paperwork was in Abu Dhabi.  Sachin withheld Shaikh's passport until just before Shaikh left for his flight on or about January 24, 2007.  In advance of the flight, Shaikh was required to sign documents in English that he could not understand.  Shaikh was not given time to review the documents or to consult with an attorney or a translator.

444.    In total, Shaikh paid over $13,800 to Sachin Dewan, Global Resources and Malvern Burnett.  To finance such payments, Shaikh borrowed large sums of money and paid exorbitant interest rates.

445.    In Mississippi, Shaikh believes he was one of five Muslim workers in the camp.  He and others asked for a small place to pray.  Signal denied their requests.  Instead, Shaikh and others had to pray in the cramped housing units.  In addition, Signal often provided only food containing pork, which Shaikh and others could not eat due to their religious beliefs.

446.    Although Shaikh was never late for work, Signal personnel sometimes punished him with unpaid leave for three days when he took too long to use the restroom during the day, even though the delays were due to the lack of adequate restrooms and the resulting long lines to use them.  On information and belief, Signal imposed these punishments because it did not have enough work for all the workers and was looking for excuses not to pay people.

447.    On at least three occasions, Shaikh become ill while at the camp -- likely because of the unhealthy work and living conditions.  Shaikh saw a doctor at the Signal facility. The doctor told Shaikh to change his diet and to tell Signal personnel to create more hygienic conditions in the camp.  Shaikh was not paid for that day's work.

448.    After the incidents on March 9, 2007, Shaikh ceased leaving the Signal camp or socializing altogether for fear that Signal would throw him in jail or deport him.  Shaikh believed that Signal was well connected with the police and could therefore exert control over the workers' lives.

449.    Shaikh left the camp on or about July 14, 2007.  After leaving, Shaikh heard from his wife in India that Sachin Dewan called her and threatened to kill Shaikh if he worked with the Southern Poverty Law Center, or otherwise participated in lawsuits.  Shaikh remains afraid of Sachin Dewan to this day.

### Plaintiff Arunkumar Shaw Narayan Shaw

450.    In or about April 2004, Shaw was working as a welder in Dubai when he saw an advertisement placed in *Gulf News* offering jobs for welders in the United States with a "job guarantee provided for 2-3 years" and "[p]ermanent lifetime settlement in the USA for self and family."  That advertisement said that a seminar regarding the opportunity would be held at a local hotel in Dubai on June 11, 2004.

451.    Shaw was unable to attend the seminar due to work commitments, but he heard about the seminar from coworkers who did attend.  These coworkers told Shaw that the speakers at the seminar -- who Shaw later learned included Sachin Dewan and Pol -- offered a green card in the United States along with the work opportunity, and assured the candidates that all accommodations and meals would be provided.  Shaw was particularly attracted to the opportunity to become a permanent resident in the United States.

88

452.    On or about April 16, 2004, Shaw called Sachin Dewan and then went to the offices of Dewan Consultants in Media City, Dubai.  In addition to Sachin Dewan, Varuna Dewan and Manesh Dewan were also in attendance.  There, Shaw and several other candidates learned more about the opportunity to work in the United States for J & M Associates.  Sachin Dewan highly recommended J & M Associates as an employer and explained that Shaw would be doing welding work for $14 to $18 per hour, plus overtime.  Sachin Dewan stated that the entire process, including the receipt of a green card, would take eighteen months.  In exchange for this opportunity, Shaw would be required to make three payments totaling 40,500 dirham.

453.    At the same meeting, Sachin Dewan explained that each installment payment, in the amount of approximately 13,500 dirham, was to be paid in thirds to each of Sachin Dewan, Global Resources and Malvern Burnett.  The payments to Sachin Dewan were to be in cash, with Global Resources and Malvern Burnett receiving payment in the form of demand drafts in U.S. dollars.  The first installment was due immediately, with the second and third installments due once the labor certification was processed for Shaw's I-140 visa application and upon issuance of the green card, respectively.  Shaw paid a portion of the first installment at that meeting and paid the remaining balance on or about July 17, 2004.

454.    Also at the meeting, Shaw met Malvern Burnett, who explained that he would be Shaw's immigration attorney and handle the green card application and related paperwork on Shaw's behalf.  Shaw asked Burnett if it was a good idea to get married before traveling to the United States, or if Shaw should wait to marry until after he moved to the United States.  Burnett advised Shaw to marry before leaving for the United States because the paperwork and processing required for a green card would be easier if Shaw were already married.  Shaw took Burnett's advice and married in January 2005.

455.   For months thereafter, Shaw heard no news from Dewan Consultants regarding the status of his green card. Shaw called Dewan Consultants' offices about twice a day but never received any updates.

456.   Over a year later, around the end of 2005, Varuna Dewan called Shaw and told him that his labor certification had been approved, and that Shaw had to pay the second installment in order to receive the labor certification. Shaw paid the second installment as required.

457.   In or about October 2006, Varuna Dewan called Shaw again, this time directing Shaw to take a trade test in Chennai. She said that after the test, Shaw would learn more about the process of going to the United States. Shaw applied for emergency leave from work and left for Chennai to take the test. Shaw paid all travel costs out of pocket.

458.   At the trade test in Chennai, Sachin Dewan and Signal personnel were in attendance. Before the test began, Sachin Dewan explained that those applicants who passed the test would be working for Signal, not J & M Associates, and that they would be receiving an H-2B visa. Sachin Dewan explained that Signal would take care of both the H-2B visa and the green card application, along with J & M Associates. Although this sudden change of plans disturbed Shaw, he felt that he had no choice but to agree to whatever Sachin Dewan said, as Shaw had already paid a large sum of money for this opportunity. Shaw passed the test and then returned to Dubai to continue working.

459.   In or about December 2006, Sachin Dewan called Shaw and directed him to go to Delhi for an interview at the U.S. consulate. At his own expense, Shaw traveled to Delhi where he met with Sachin Dewan's agents. Sachin Dewan and those agents told Shaw and other applicants not to mention anything to the consulate about money that they had paid for the visa

opportunity and warned that if they did so, the consulate would decline their visas.  Sachin

Dewan also directed everyone not to mention the green card applications or J & M Associates, as

the interview was only related to the H-2B visa for Signal.

       460.    On or about December 12, 2006, Shaw appeared for his consulate

interview.  After the interview, the consulate gave Shaw a paper receipt to retrieve his passport.

Upon leaving the consulate, one of Sachin Dewan's agents confronted Shaw and demanded that

Shaw hand the receipt and other paperwork over to the agent.  Shaw reluctantly handed the

documents over, as he saw no other choice.  Sachin Dewan was an extremely powerful and

politically connected person in India with numerous associates.  Given the large sums of money

that Shaw had already paid, Shaw reasonably believed that he had no choice but to hand the

documents to Sachin Dewan.

       461.    At Sachin Dewan's instruction, Shaw remained in Delhi for a few days

longer.  Shaw later received the passport receipt from Sachin Dewan, who instructed him to

retrieve his passport.  Upon exiting the consulate with his passport, Sachin Dewan's agent

collected Shaw's passport.  Shaw became very worried about not having his passport because he

needed it to return to his job in Dubai in the event that he could not travel to the United States, to

travel to Dubai to properly cancel his guestworker visa and to collect additional money to pay for

the final installment.  Shaw called Sachin Dewan and asked for his passport back, but Sachin

Dewan said that Shaw would only receive his passport once he paid the final installment.

Because Shaw could not return to Dubai to collect money for the payment, Shaw used his wife's

jewelry as collateral for a loan.

462.    In or about December 2006, Shaw paid the third installment, in the form

of cash to Sachin Dewan and a personal check to Global Resources and Malvern Burnett.  Shaw

received his passport in return.

463.    On or about January 23, 2007, Shaw traveled to Sachin Dewan's offices in

Mumbai.  At the offices, Sachin Dewan said Shaw and other applicants had to return all receipts

and paperwork that they had received from Sachin Dewan in the past and sign various

documents in English before they could leave for the United States.  Shaw told Sachin Dewan

that he did not have the paperwork with him and therefore did not return it.  Shaw was also

required to quickly sign several documents.  Shaw was not given time to review the documents --

which were in English and difficult for him to understand -- and was told they were merely a

formality.  After Shaw signed the documents, he received his plane ticket, and traveled to

Mississippi over the next two days.

464.    In total, Shaw paid over $11,000 to Sachin Dewan, Global Resources and

Malvern Burnett.  To finance such payments, Shaw borrowed large sums of money and paid

exorbitant interest rates, putting up valuable property as collateral for the loans.

465.    At the Signal worksite in Mississippi, Signal personnel would single out

the Indian workers from other workers and hassle them whenever they wanted to take a rest or

break for a drink.  The Indian workers feared that if Signal personnel complained about them,

they could be terminated, deported or worse.

466.    On March 9, 2007, Shaw recalls seeing, through a window in that room,

four Indian workers locked in a room guarded by Signal personnel.  At a camp meeting

following that incident, Signal personnel told the workers that Malvern Burnett was a skilled

92

attorney who is powerful in the community and that workers who caused trouble would be sent back to India.

467.    Soon thereafter, Sachin Dewan visited the camp. Shaw had heard from other workers that Sachin Dewan had called the wife of the worker involved in the incidents of March 9, 2007, Sabulal Vijayan, and threatened Vijayan's life. Shaw feared Sachin Dewan might take similar action against his family in India because he was a powerful person there and knew Shaw's family address.

468.    In or around the second week of July 2007, Shaw escaped the camp, fearing that when Signal personnel found out he left, they would send security or police after him and have him deported.

### Plaintiff Subash Chandra Shukla

469.    In or about February 2004, while Shukla was working in Saudi Arabia, a friend of his told him about an advertisement offering an opportunity to immigrate to the United States with a green card and a guaranteed job. Sachin Dewan's name appeared on the advertisement.

470.    In or about March 2004, while Shukla was in India, he called Sachin Dewan at his offices in Mumbai. Sachin Dewan told Shukla that he would make significantly more money at a job in the United States, that he would receive a green card and that his wife and children would also be given permanent residency in the United States. Sachin Dewan said the process would take nine to eighteen months.

471.    In or about March 2004, as a result of these promises -- particularly of living with his family in the United States and getting permanent residency -- Shukla signed a contract provided by Sachin Dewan. The contract was written in English, and Shukla could not understand it. Sachin Dewan afforded him no opportunity to have it translated, and presented it

as a take-it-or-leave-it offer. When Shukla asked questions about the contract he was told not to worry.

472.    At the same meeting, Sachin Dewan told Shukla to pay the first of three installments of approximately $3,690. The payment would be split in equal parts between Sachin Dewan, Global Resources and Malvern Burnett. Shukla paid Sachin Dewan a "down payment" of approximately $1,107 at this first meeting.

473.    In or about July 2004, Shukla paid the balance of the first installment of $3,690.

474.    In or about March 2005, Shukla paid the second installment of approximately $3,690.

475.    In or about September 2006, Sachin Dewan told Shukla to go to the United States Embassy to apply for a visa because there was a problem obtaining his green card. Sachin Dewan told Shukla not to worry because Shukla would receive a three-year visa and then a green card when he arrived in the United States. Shukla was furious and terrified because he expected a green card, paid to get the green card and quit a great job on the promise of that green card. He demanded his money back, but Sachin Dewan refused to make the refund and told Shukla that he would lose all the money if he did not proceed as directed. Shukla felt compelled to settle for a three-year visa for fear of losing his money and of what would happen if he did not earn a salary in the United States to pay off his loans.

476.    In or about November 2006, Shukla paid the final installment, which Sachin Dewan unexpectedly increased to approximately $4,321.

477.    In total, Shukla paid a total of approximately $11,737. To make the payments, Shukla emptied his family's savings, and took loans from friends and acquaintances.

94

To this day, he has still not paid back the loans, some of which are accruing interest at a rate of 3 percent.

478.   Two days after making the final payment, Shukla obtained his visa. Shukla was shocked that it was only valid for ten months and not three years, as Sachin Dewan had promised. Shukla asked Sachin Dewan's assistant, Ramesh, about the shortened term but was told not to worry because Malvern Burnett would take care of it when Shukla arrived in the United States.

479.   In or about November 2006, Shukla traveled to Mississippi. Throughout the camp he saw posters with pictures of cameras that said "I'm watching you."

480.   Shukla's religion prohibits him from eating any meat. Signal often gave him no food choices -- either he could eat meat or go hungry. Rather than starve, Shukla was forced to violate his religion by eating meat.

481.   Signal personnel made threats to Shukla and the other workers. They said that if the workers got out of line or asked too many questions, Signal would stop them from getting green cards and would seal their bank accounts. After another worker complained about the working conditions, Signal personnel told Shukla and a group of workers that the complaining worker had been sent back to India.

482.   On one occasion, Signal gave the workers three days off for Thanksgiving. Shukla wanted to travel with several other workers to visit a friend in Houston, Texas. To do so, Signal required the workers to write a letter explaining who they were going to see, where they were going, how long they would be gone and the reason for going. Signal approved the letter, but instructed them never to ask to leave again, and told them their visas were not approved yet

and so they were at risk of being apprehended by immigration or the police. They were told Signal would not help them if that happened.

483.    In or about July 2007, Shukla suffered a debilitating back injury while replacing parts because of poor safety conditions at work. Shukla feared he and his team would get in trouble if they did not finish the job, so he continued working with the injury. Signal personnel checked on Shukla the following day and a nurse prescribed pain medication. Despite intense and persistent pain, Shukla returned to work four days later because he feared he would be harmed or deported if he did not work.

484.    In or about July 2008, Shukla suffered a severe burn. Because Signal crowded workers into small workspaces, a piece of hot metal fell from a worker above onto Shukla's foot and burned through to the bone. Shukla could not go to the nurse because he had not completed his work and would lose a day's pay if he left at that time. By the time he finished his shift, the nurse was gone. Shukla went to the nurse the following morning and the nurse refused to send Shukla to the doctor despite his repeated requests. Instead, the nurse prescribed some cream for the wound. While he recovered, Shukla was not given leave from work but was reassigned to clean the camp. Despite the persistent pain, Shukla went back to work on the rig after one week because he feared Signal would not keep its promise of obtaining a green card for him if he did not work.

485.    In or about December 2008, Signal fired Shukla. Signal personnel said this was because Signal had no more work for him.

### Plaintiff Ajith Chellayyan Swarnamma

486.    In or about January or February 2004, Swarnamma was working as a welder in Saudi Arabia and was on vacation home to Trivandrum, India when he saw an advertisement placed in a local newspaper. The advertisement offered immediate openings for

welders and the opportunity to move to the United States with green cards for Swarnamma and his family. The advertisement requested that anyone interested either make contact or appear for testing in Kochi, India.

487.    In or about the end of January or beginning of February 2004, Swarnamma went to a hotel in Kochi for trade testing. Sachin Dewan, Pol and Dewan's agent, Salimon, were all present at the meeting. These three men promised Swarnamma an immediate and permanent job in California with NASSCO Corporation, as well as a green card. While Swarnamma enjoyed his job in Saudi Arabia, he decided to take the opportunity for a green card in the United States. Sachin Dewan promised to complete the necessary paperwork and take care of all the processing for a fee of 650,000 rupees. According to Sachin Dewan, the entire process would take three to four months to complete. It was emphasized that the candidates could bring their families with them to the United States.

488.    Sachin Dewan explained that the payments were to be made in three installments. The first installment was due immediately. Some payments were to be made in Indian cash and others were to be converted from check to U.S. dollars.

489.    Swarnamma paid the first installment in March 2004, to either Sachin Dewan or his agent, Salimon. To make the first payment, Swarnamma depleted his life savings.

490.    After depleting his savings to make the first payment, Swarnamma borrowed money from banks and from friends to pay the second installment. Swarnamma was asked to pay the second installment because his visa processing was progressing and he would be leaving for the United States in three to four months. Swarnamma believes either Sachin Dewan or his agent, Salimon, were present when he made the payment, as well as an American, likely either Malvern Burnett or Pol.

491.    In or about mid-2005, Swarnamma resigned his job in Saudi Arabia at J & M Associates's direction and returned to India because he was told he would be traveling to the United States any day. While waiting to travel, Swarnamma could not take another job in India because he expected he would need to leave at any time. Had Swarnamma not resigned, he could have continued working at his job in Saudi Arabia indefinitely and continued to receive promotions and comfortable living accommodations there.

492.    Swarnamma remained in India without work for over a year without hearing anything about his immigration processing.

493.    In or about September 2006, Swarnamma received notice of his interview at the U.S. consulate. By this time, Swarnamma had taken out substantial debt, foregone other work opportunities and waited for his U.S. opportunity to materialize. He felt pressured by Sachin Dewan and his agent, Salimon, to complete his payments. Swarnamma also feared that asking for a refund would jeopardize the opportunity he had invested in because he had heard that other applicants that requested refunds had been denied and had not been able to travel to the United States.

494.    In or about early November 2006, Swarnamma met with Sachin Dewan and his agent, Salimon, prior to his interview at the consulate. These men told Swarnamma to tell the consulate that he was seeking temporary rather than permanent visa status, and not to reveal the fee amount he had paid in connection with processing his visa. At this meeting, the men also told Swarnamma he would be working for a company called Signal in Mississippi, instead of working for NASSCO in California. Swarnamma surrendered his passport at the consulate.

98

495.    A couple of weeks later, Swarnamma met with Sachin Dewan at his office in Mumbai.  Sachin Dewan and his agent, Salimon, had retained Swarnamma's passport and demanded his final payment before they would return it.  To make the final payment, Swarnamma borrowed additional money and used money from his wedding gifts.  Swarnamma made the payment and received his passport.

496.    In or about the end of November 2006, or early December 2006, Swarnamma flew to the United States.  Swarnamma traveled to the United States without a green card but was under the impression that his green card was still being processed for him.  He never doubted that J & M Associates would fulfill its promise to obtain his green card.

497.    By July 2013, Swarnamma estimates that he had been able to pay off approximately two-thirds of the loans he took out to pay the 650,000 rupee fee.  He has paid a 20 percent interest rate on his loans and still retains approximately 280,000 rupees of debt.

### Plaintiff Shibu Thankachan

498.    In or about December 2004, while working as a pipe welder in Saudi Arabia and home in India for the holidays, Thankachan saw an advertisement in a local Indian newspaper, *Malayala Manorama*.  The advertisement said that Dewan Consultants was recruiting welders and pipefitters to work for J & M Associates in the United States.  The advertisement promised that successful candidates would receive a green card in the United States.  Interested candidates were advised to attend a seminar hosted by Dewan Consultants.

499.    In or about December 2004, Thankachan attended a recruitment seminar led by Sachin Dewan and Pol.  At the seminar, Sachin Dewan and Pol explained that J & M Associates was seeking pipefitters and welders for two-year contracts and that workers would obtain green cards for themselves and their families.  Sachin Dewan and Pol stated that the candidates would need to make three installment payments of approximately 155,000 rupees

each for processing their applications and green cards.  The installments were to be paid to Sachin Dewan in cash and to Global Resources and Malvern Burnett by check.  The first installment would be due after the seminar, the second installment would be due after each worker received his work authorization, and the final installment would be due right before each worker left for the United States.  Thankachan was also informed that he could bring his family for an additional fee of $650 per person.  Sachin Dewan and Pol explained that the process would take approximately eighteen to twenty-four months.

500.    In or about February 2005, Thankachan made his first installment payment.  To afford this payment, Thankachan took out a bank mortgage on land that he owned and also took out a loan from a local loan shark at an interest rate of 5 percent per month.

501.    In or about March 2006, Thankachan paid his second installment payment. To afford this payment, Thankachan took out an additional loan from the same local loan shark, again at an interest rate of 5 percent per month.  After Thankachan paid his second installment, he called Dewan Consultants' offices several times to ask about the next step in the application process.  Eventually, Thankachan informed Dewan's agent, Salimon, that he wanted to resign from the recruitment process and receive a refund of the fees he had already paid.  Salimon informed him that he would not be able to receive a full refund, but might be able to receive a partial refund if Thankachan could locate another worker to take his place.  Thankachan did not withdraw.

502.    In or about September 2006, while Thankachan was working in Saudi Arabia, Dewan's agent, Salimon, called him and asked him to return to India because his green card was ready.  Thankachan resigned from his job in Saudi Arabia without notice, thus forfeiting $15,000 in seniority-based bonus payments from his employer.  When Thankachan

returned to India, Salimon informed him that his green card was not in fact ready and that there was no longer an opportunity to work for J & M Associates. Instead, the available job opportunity was to work for Signal and receive an H-2B visa. Thankachan was informed that the visa would be extended and then eventually processed for a green card.

503.     In or about November 2006, Dewan's agent, Salimon, informed Thankachan that he would need to take a welding test. Signal personnel were present at Thankachan's trade test.

504.     In or about November 2006, Thankachan was also told to interview with the U.S. consulate in India. Before the interview, Dewan's agent, Salimon, instructed Thankachan not to say anything about his intention to remain permanently in the United States or about the payments he had made for the visa opportunity. After the interview, the consulate returned the passport to Dewan Consultants' offices.

505.     On or about December 4, 2006, Dewan's agent, Salimon, called Thankachan and told him that he would be leaving for the United States on December 7, 2006. Thankachan was told that he would need to fly to Dewan Consultants' offices in Mumbai, at his own expense, to pay the final installment, and receive his plane ticket. Thankachan did so and paid the third installment. To afford this payment, Thankachan took out an additional loan from the same local loan shark at an interest rate of 5 percent per month and sold some of his family's gold.

506.     In total, Thankachan paid approximately $13,260 to Sachin Dewan, Global Resources and Malvern Burnett, including related expenses such as testing fees, airfare, and immigration fees.

507.   At the Signal camp in Mississippi, Thankachan was not allowed to leave other than to go to work, go to Wal-Mart once a week and attend the Pentecostal church of one of the Signal personnel -- visits to other places of worship were not permitted.

508.   When arriving at the camp because of the incidents on March 9, 2007, Thankachan recalls that even the police said they were surprised by the harsh conditions at the camp.

509.   On or about March 24, 2007, Thankachan escaped the camp by climbing the fence under the cover of night. After he left, Signal punished him and others by freezing the bank accounts Signal had helped the workers open. The accounts were only unfrozen after the workers received assistance from a charity group.

### Plaintiff Jaison Antony Thekkumpuram

510.   In or about February 2004, when he was working in Dubai, Thekkumpuram saw an advertisement in a newspaper seeking fitters and welders for positions in the United States. As directed by the advertisement, Thekkumpuram contacted the office of Dewan Consultants in Media City, Dubai. Thekkumpuram registered his name for the opportunity and learned that there would be a meeting with Americans in attendance in March or April 2004.

511.   In or about the end of March 2004, Thekkumpuram went to a meeting at a Dubai hotel led by Sachin Dewan, Manesh Dewan, Varuna Dewan, Pol and Malvern Burnett. These individuals represented J & M Associates. They told candidates at the meeting that the job offered $14 per hour, plus a $6 per hour allowance per diem, free transportation, accommodation, and a guarantee of permanent resident status for candidates and their families within eighteen to twenty-four months. After getting their green cards, candidates would be required to work for J & M Associates for two years. Alternatively, after six months they could

pay $5,000 to be released from the two-year contract so that they could work anywhere in the United States.

512.   Thekkumpuram did not sign a contract in the first meeting because he was asked to pay a total of $14,000 and he was earning $550 per month in salary in Dubai at the time. The $14,000 payment was to made in three installments, each split three ways between Dewan Consultants, Global Resources and Malvern Burnett.  Those leading the meeting promised to return candidates' money if they failed their interviews at the U.S. consulate.

513.   In or about April 2004, Thekkumpuram attended a meeting organized by Dewan Consultants at a Hilton Hotel in Kochi, India.  He sold his wife's gold jewelry for $1,500 and paid the amount to Sachin Dewan, but it was not enough to cover what Sachin Dewan demanded.  Sachin Dewan told Thekkumpuram he had one week to pay the balance or he would remove Thekkumpuram's name from the list.  Thekkumpuram went back to Dubai and borrowed $3,000 with interest from a private money lender.  Thekkumpuram gave this sum to Sachin Dewan in the presence of Varuna Dewan, but received a receipt for only the portion of the payment that Sachin Dewan would keep, not the portions to be given to Global Resources and Malvern Burnett.

514.   In or about the end of January 2006, Dewan's agent, Salimon, called Thekkumpuram to say his labor certification was ready and ask for payment of the second installment.  To make the payment, Thekkumpuram used his savings and borrowed money from friends and family.  Thekkumpuram paid $1,250 in cash to Sachin Dewan and did not receive a receipt.  He paid $1,250 to each of Global Resources and Malvern Burnett by check.

515.   When he paid the second installment, Thekkumpuram spoke to Sachin Dewan and his agent, Salimon.  He told them that he did not have a job and could not pay the

third installment. They told Thekkumpuram he would need to pay the third installment within six months when his visa was ready. To earn the amount for the third installment, Sachin Dewan and Salimon sent Thekkumpuram to Saudi Arabia to work a low-paying job where he earned $300 a month for six months. In exchange for this arrangement, Thekkumpuram had to pay an additional $250.

516. After six months, Thekkumpuram heard that Sachin Dewan was sending applicants to the United States. He contacted Dewan's agent, Salimon, and asked about the status of his green card. Salimon said that his green card would involve more delay, and that if Thekkumpuram preferred, he could go to the United States sooner on an H-2B visa for an additional fee of $1,000, plus airfare. The job in the United States would pay $18 per hour, and provide free accommodations. Thekkumpuram would pay only a little for food. Salimon explained that after Thekkumpuram's green card was approved, he could come back to India and then return to the United States with permanent status.

517. To pay the final installment and these additional fees, Thekkumpuram had to sell his only property, a plot of land, for $4,000. He also had to borrow $1,250 from his father-in-law.

518. Dewan's agent, Salimon, contacted Thekkumpuram to direct him to come to Chennai to pay the fee and to appear for his U.S. consulate interview. In or about the end of October 2006, Thekkumpuram reached Chennai by train and met Sachin Dewan, Salimon and Signal personnel. These men said that Signal would obtain H-2B visas and then green cards for the applicants. They also instructed Thekkumpuram to tell the consulate, and sign a statement saying, that he only paid $750 in connection with his visa. They did not let Thekkumpuram have a copy of this statement. This made him very uncomfortable, but Thekkumpuram trusted Sachin

Dewan because he was from his home state of Kerala. Sachin Dewan then gave Thekkumpuram

a letter telling him to pay $1,460 to Global Resources and the same amount to Malvern Burnett

after he passed the trade test. This letter also first notified Thekkumpuram that Signal would not

provide free accommodation, as originally promised.

      519.    At the consulate interview, the interviewer collected Thekkumpuram's

passport.

      520.    Shortly after returning to Kerala, Thekkumpuram received a call from

Dewan's agent, Salimon, who said that his visa was approved. Thekkumpuram had to prepare

the third installment and prepare to depart for the United States.

      521.    On or about December 6, 2006, Thekkumpuram went to Sachin Dewan's

office in Mumbai, which was an intimidating place because there were many "thugs" standing

around the office, and Thekkumpuram heard Sachin Dewan yelling at people. He handed his

money directly to Sachin Dewan, who told him to sign some papers. He did not get time to read

what he was signing. However, he noticed a document concerning his labor certification that

permitted unrestricted transfer of the certificate. This document worried Thekkumpuram, and he

asked about it. Sachin Dewan repeated that Signal would process his green card. Sachin Dewan

gave him a copy of the letter from Signal offering permanent residence status. Sachin Dewan

had possession of Thekkumpuram's passport and only returned it to him after he had paid and

signed and returned the paperwork.

      522.    After Thekkumpuram and others paid the third installment, Sachin Dewan

shared more details about the job. Contrary to what Sachin Dewan and others had told the

applicants at the earlier meeting, he said Signal would deduct $35 per day for room and board.

Prior to this, the applicants had been told they would only have to pay a small amount for food.

Thekkumpuram felt deceived, but because of the intimidating atmosphere of Sachin Dewan's office, he knew that by this point, he lacked the option to back out and get his money back.

523.   In total, Thekkumpuram paid over $15,250 to Sachin Dewan, Global Resources and Malvern Burnett.  To finance such payments, Thekkumpuram sold many of his family's assets and borrowed large sums of money with high interest rates from lenders, family and friends.

524.   On or about December 7, 2006, Thekkumpuram traveled to Mississippi. When he arrived, the camp looked like a refugee camp.  He often saw snakes near the door of his housing unit.  There was also a wasp nest inside his housing unit, and he was stung by a yellow jacket on his second day at the camp.

525.   Thekkumpuram witnessed the incident on March 9, 2007 in which one worker cut his wrist when Signal personnel came to retrieve him.  Thekkumpuram saw that worker bleeding profusely and heard him crying, "I have no other way, don't sent me back to India."  At the time, armed Signal personnel and some other workers were in the room. Thekkumpuram feared the police would arrest him and the other workers after this incident.

526.   In or about August 2007, Malvern Burnett filed his I-140 application for him based on his labor certification with J & M Associates.  Malvern Burnett refused to file his I-485 for him and directed him to another lawyer, Ram Cheerath, for a $500 transfer fee.

527.   On or about November 30, 2007, Thekkumpuram escaped the Signal camp at midnight and got a ride from a friend to take a position with J & M Associates in Florida. Thekkumpuram was so scared to be caught leaving Signal that he left his valuables behind.

### Plaintiff Shajan Varghese

528.   Plaintiff Shajan Varghese was recruited beginning in or about February 2004 and arrived in the United States in or about December 2006.

529.    In or about February 2004, while he was working in Dubai, a friend of Varghese's told him about an advertisement for a job opportunity in the United States. Varghese was interested in the opportunity because it would provide a higher salary, $18 per hour plus overtime, and offered the opportunity to obtain a green card.

530.    In or about late February 2004, Varghese attended a recruitment seminar in Dubai hosted by Sachin Dewan. During this seminar, Sachin Dewan said that there were job opportunities for pipefitters in the United States with J & M Associates, that candidates would be eligible for green cards and that it would take approximately eighteen months to obtain the necessary labor certifications to work in the United States.

531.    Varghese paid three installments of approximately 12,500 dirham each for the opportunity to work in the United States.

532.    On or about April 14, 2004, Varghese paid his first installment using money he had saved from his work in Dubai. Varghese made the payment by giving three checks for equal amounts to Sachin Dewan, Global Resources and Malvern Burnett. Varghese was told it would take about nine months for his papers to be ready and that he would make his second payment at that time.

533.    On or about February 18, 2006, Varghese paid the second installment. In order to make the payment, he borrowed money from friends and took out a loan at a 9 percent interest rate. After paying the second installment, Varghese was told that Hurricane Katrina had caused several delays and it would be approximately one more year before he would receive final approval to work in the United States.

534.    On or about August 2006, Varghese went on leave from his job in Dubai and returned to India. Varghese contacted Dewan's agent, Salimon. Salimon informed him that

workers were now being processed for H-2B visas, instead of green cards, and he would be working for Signal in the United States, instead of J & M Associates. Salimon informed Varghese that the H-2B visa could be renewed and then automatically processed as a green card.

535.   In or about November 2006, Varghese was asked to attend a training and seminar at a hotel in Chennai. At the seminar, Varghese took and passed a written pipefitting test. Sachin Dewan also prepared the applicants for their interview with the U.S. consulate. During this interview preparation, Sachin Dewan instructed Varghese to tell the consulate that he would only be working in the United States for six months and then would return to India. He was also instructed not to mention any of the payments he had made for the visa opportunity. After the interview at the consulate, Sachin Dewan told Varghese that he could expect to leave for the United States within a few days.

536.   In or about December 2006, Varghese was approved to travel to the United States. At this time, he made his final installment payment of 150,000 rupees in cash to Sachin Dewan and gave Sachin Dewan checks for Global Resources and Malvern Burnett. To make this payment, he took out a loan on property his father gave him. Varghese paid the final installment and departed for the United States.

537.   At the Signal camp in Mississippi, on or about February 19, 2007, Varghese was told that Signal did not have any more work for him unless he worked for $10 per hour. At this rate, Varghese knew he could never repay the debt he took out to pay the recruitment fees. Varghese decided to leave the camp.

### Plaintiff Thomas Varghese Vattakkattu

538.   In early 2005, Vattakkattu saw an advertisement in a local Indian newspaper, *Malayala Manorama*, for an opportunity for employment and permanent residency

in the United States for applicants and their families.  The advertisement referenced a seminar about the opportunity, which Vattakkattu attended at the Triton Hilton Hotel in Kochi, India.

539.  In or about February 2005, Sachin Dewan, Dewan's agent, Salimon, Malvern Burnett and Pol were all present at the seminar.  They explained that the job would be in California, would pay $16 an hour, $21 an hour overtime, and would include a $60 per diem allowance for food and housing.  They also explained that the opportunity would include a green card, which would take nine to twelve months to process.  The cost to the applicants was $14,500, plus $1,500 for each family member, and payment would be made in three installments, each split between Sachin Dewan, Global Resources and Malvern Burnett.  Vattakkattu paid the first installment at or about the time of the seminar.

540.  Vattakkattu received his labor certification in early 2006.  In mid-2006, Sachin Dewan informed him that the green card application process would take a long time because Malvern Burnett's office had been destroyed by Hurricane Katrina, including the paperwork of Vattakkattu and other applicants.  Sachin Dewan said, however, that there was a new opportunity to work for Signal with an H-2B visa.  When asked about the promised green card opportunity, Sachin Dewan stated that H-2B visas could be extended and, during the extension period, a green card application would be made.  Sachin Dewan also told Vattakkattu that Malvern Burnett would ensure Vattakkattu's family could come to the United States. Having already borrowed and paid money, and faced with the prospect of having nothing to show for it, Vattakkattu had no choice but to move forward with Signal and an H-2B visa.

541.  In mid-2006, Vattakkattu took and passed a welding and pipefitting test that was administered in Chennai.  Sachin Dewan and Signal personnel were present at the test. Vattakkattu then paid the second installment.

542.   At or about the end of October 2006, Vattakkattu was interviewed by the U.S. consulate. Prior to the interview, Vattakkattu attended a meeting with Sachin Dewan and Malvern Burnett in which he was instructed on how to handle the interview. These instructions included being warned not to mention money he had paid for the visa opportunity and, if he did, he and the other applicants would be denied visas.

543.   Although the consulate told Vattakkattu that he would receive his passport by mail, Sachin Dewan stated later that Vattakkattu would receive his passport from Dewan Consultants. Vattakkattu had to travel to Dewan Consultants' Mumbai offices to get his passport back. Before returning Vattakkattu's passport, Sachin Dewan insisted that Vattakkattu sign papers without being given an opportunity to read or understand them. Sachin Dewan took those papers and other papers and receipts that he had provided to Vattakkattu earlier in the process.

544.   In total, Vattakkattu paid approximately $17,500 dollars to pursue this opportunity for himself, his wife and his daughter. He raised money by selling his wife's jewelry and taking out loans from moneylenders at exorbitant interest rates. Today, Vattakkattu is still repaying moneylenders what he borrowed.

545.   At the Signal camp in Mississippi, Vattakkattu's housing unit was initially very cold. Then Signal turned the heat on high, which blew directly on Vattakkattu's bed. Signal did nothing in response to Vattakkattu's complaints about the heater and he had no other place to which he could escape.

546.   Vattakkattu worked as a pipefitter for Signal and was forced to work, cut and weld under dangerous conditions, including in confined places with crude oil, where a small mistake could have resulted in a dangerous fire. Signal personnel consistently harassed Vattakkattu and his Indian colleagues, including referring to them as "motherfucker" when

110

directing their work. Vattakkattu's non-Indian colleagues were not subjected to this same treatment.

547.    Vattakkattu was unable to visit with family because of Signal's policy against allowing him to have guests at the camp. At Christmas, Vattakkattu's brother traveled to the camp to visit, but Signal personnel would not permit him to enter the camp, nor did they inform Vattakkattu that his brother was waiting at the gate. After hours had passed, one of Vattakkattu's friends was coming in after work, spoke to Vattakkattu's brother, and informed Vattakkattu of the situation. When he went out, the Signal personnel would not let Vattakkattu leave with his brother. As a result, the two were limited to a visit, outside, of about thirty minutes.

548.    In or about April 2007, Sachin Dewan called Vattakkattu's home and offered tickets for Vattakkattu and all of his family to travel to Mumbai if Vattakkattu would tell a judge, via videoconference, that all of the conditions at Signal were good. Vattakkattu refused to do so.

549.    When Vattakkattu prepared to leave the camp for another opportunity in November 2007, Malvern Burnett charged him $500 to release the files necessary to pursue this other opportunity.

## FIRST CLAIM FOR RELIEF
### Forced Labor (18 U.S.C. § 1589) And Trafficking With Respect To Peonage, Slavery, Involuntary Servitude, Or Forced Labor (18 U.S.C. § 1590)

550.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

551.    Each Plaintiff brings this claim against all Defendants.

552.    Each Plaintiff is authorized to bring these civil claims against all Defendants pursuant to the civil remedies provisions of 18 U.S.C. § 1595.

111

553.    Defendants Signal, Dewan, Burnett, and Global Resources attempted to and did subject each Plaintiff to forced labor in violation of 18 U.S.C. § 1589.

554.    Defendant Signal employed Plaintiffs in dangerous conditions at a guarded and gated camp, and all Defendants falsely assured Plaintiffs that if they continued to work, Signal would assist them in applying for and receiving green cards.  Defendants controlled Plaintiffs' housing, food, access to medical care and other basic needs, and if Plaintiffs did not continue working for Signal, they would have been cut off from those needs.

555.    Furthermore, the substantial "recruitment fees" that Defendants coerced Plaintiffs into paying forced Plaintiffs to work at Signal to pay off their substantial debts.

556.    Defendants knowingly attempted to and did physically restrain and/or threaten each Plaintiff with serious harm in order to obtain the labor and services of each Plaintiff in violation of 18 U.S.C. § 1589(1).

557.    Defendants knowingly attempted to and did obtain the labor and services of each Plaintiff using a scheme, plan or pattern which, in the totality of the circumstances, was intended to coerce and did coerce each Plaintiff to believe that he would suffer serious harm if he were to leave the employ of Defendant Signal in violation of 18 U.S.C. § 1589(2).

558.    Defendants' scheme to isolate Plaintiffs, coerce them to live in conditions causing psychological harm and limit their outside contacts, which included unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm if they were to leave the employ of Signal.

559.    Defendants threatened not to extend Plaintiffs' H-2B visas, not to sponsor Plaintiffs for green cards, to deport Plaintiffs and to send them back to India if they complained about conditions at Signal, and also deceived Plaintiffs about the terms of their immigration

112

status, each in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3). Defendants retaliated against Plaintiffs when they sought legal advice regarding their rights and immigration status.

560.   Defendants knowingly recruited, transported, harbored, provided and/or obtained Plaintiffs so as to procure their labor and services in violation of laws prohibiting peonage, involuntary servitude and forced labor within the meaning of the provisions of 18 U.S.C. § 1590.

561.   In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants knowingly recruited, transported, harbored and/or obtained Plaintiffs for labor or services in furtherance of Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

(a)   enticing, persuading or inducing Plaintiffs to board an airliner and to travel to various locations throughout India and the United States, with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

(b)   knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by 22 U.S.C. § 7102(6)(a) and (b), thereby violating 18 U.S.C. § 1584;

(c)   removing, confiscating or possessing Plaintiffs' and other class members' passports and other immigration documents in the course of violating, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589 and 1590, thereby violating 18 U.S.C. § 1592(a); and

(d)   attempting to violate 18 U.S.C. §§ 1583, 1584, 1589 and 1590, thereby violating 18 U.S.C. § 1594(a).

562.   Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

113

563.   As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their persons, businesses and property, as well as other damages.  Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including recruitment fees, other payments made to Signal agents and attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Violations Of 42 U.S.C. § 1981

564.   Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

565.   Each Plaintiff asserts this claim pursuant to 42 U.S.C. § 1981 for declaratory relief and damages against Defendant Signal.

566.   The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to make and enforce contracts and to receive the full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Defendant Signal.

567.   Specifically, Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at Signal camps in Pascagoula.  Defendant Signal did not subject its employees of non-Indian race, ethnicity or alienage to the same or similar room and board arrangements.

568.   As set forth in the preceding paragraphs, Defendant Signal also imposed on Plaintiffs discriminatory job-related requirements and adverse terms and conditions of employment to which its employees of non-Indian race, ethnicity or alienage were not similarly subjected.

569.   As set forth in the preceding paragraphs, Defendant Signal also created and fostered a discriminatory work environment in which Indian workers were subjected to anti-

114

Indian invective throughout the time Plaintiffs were employed.  Signal employees of non-Indian race, ethnicity or alienage were not subjected to a similar work environment.

570.    As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Plaintiffs and other Indian H-2B workers, Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race, ethnicity, religion and alienage throughout the time Plaintiffs were employed.

571.    As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981 throughout the time Plaintiffs were employed.

572.    Plaintiffs reasonably perceived their work environment to be hostile, abusive and discriminatory on the basis of their race, ethnicity, religion and alienage.

573.    Defendant Signal's hostile, abusive and discriminatory treatment of Plaintiffs and other class members was unwelcome.

574.    Defendant Signal knowingly, willfully, maliciously, intentionally and without justification acted to deprive Plaintiffs of their rights.

575.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

576.    As a direct and proximate result of Defendants' knowing, willing and intentional actions, each Plaintiff has been injured and is entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## THIRD CLAIM FOR RELIEF
### *Fraudulent Misrepresentation*

577.   Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

578.   Each Plaintiff brings this claim against all Defendants.

579.   The actions of Defendants, as set forth herein, constitute fraudulent misrepresentation under Mississippi law.

580.   Specifically, Defendants, individually and through their agents, employees and/or representatives, knowingly made material and false representations and omissions of fact to Plaintiffs regarding the nature, terms and conditions of applications and opportunities for immigration status and employment in the United States.

581.   Defendants and/or their respective agents represented to each Plaintiff that (1) Plaintiffs would be eligible for permanent residency given their employment with Signal; (2) Defendants would apply for permanent residency in the United States on behalf of Plaintiffs no later than twenty-four months after the commencement of work; (3) no additional fees would be required to secure Plaintiffs' permanent residence in the United States; and (4) Plaintiffs would have steady and ongoing work opportunities in the United States with Defendant Signal.

582.   At the time each of these representations were made, Defendants knew they were false or misleading.

583.   Defendants intended that the false statements made by each Defendant and/or Defendants' respective agents, employees and/or representatives would induce Plaintiffs to pay the exorbitant "recruitment fees," would induce Plaintiffs to leave their homes and jobs abroad, travel to the United States and work for Signal, and would induce Plaintiffs to pay the

116

room and board fee and other fees extracted by Signal upon the workers' arrival in the United States.

584.    Each Plaintiff was entitled to, and did, rely on Defendants' representations.

585.    In reasonable reliance on the false representations of Defendants and their respective agents, employees and/or representatives regarding green cards, employment opportunities and employment conditions, Plaintiffs paid large sums of money and incurred substantial debt in the guise of "recruitment fees" and other travel- and immigration-related fees. Signal knew of these payments and permitted them to be made to its agents.

586.    In reasonable reliance on the false representations of Defendants and their respective agents, employees and/or representatives regarding green cards, employment opportunities and employment conditions, Plaintiffs surrendered employment opportunities in India and abroad, left their homes and families behind, sold personal and real property, secured loans at usurious interest rates, traveled to the United States and worked for Signal. Further, once in the United States, Plaintiffs continued to work for Signal after receiving repeated assurances that Defendants' prior representations were in fact true.

587.    No later than the first day that Indian workers arrived at Signal, Defendants knew that Plaintiffs and their coworkers believed that Defendants had applied, or were intending to apply, for permanent residency on behalf of Plaintiffs. Defendants therefore had an obligation to tell Plaintiffs that this was not true. Defendants failed to do so.

588.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

589.     As a direct and proximate result of Defendants' knowing, willing and intentional actions, each Plaintiff has been injured and is entitled to recover compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation

590.     Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

591.     Each Plaintiff brings this claim against all Defendants.

592.     The actions of Defendants, as set forth herein, constitute negligent misrepresentation under Mississippi law.

593.     Specifically, Defendants, individually and through their agents, employees and/or representatives, negligently made material and false representations and omissions of fact to Plaintiffs regarding the nature, terms and conditions of applications and opportunities for immigration status and employment in the United States.

594.     Defendants represented to each Plaintiff that (1) Plaintiffs would be eligible for permanent residency upon the conclusion of their employment with Signal; (2) Defendants would apply for permanent residency in the United States on behalf of Plaintiffs no later than twenty-four months after the commencement of work; (3) no additional fees would be required to secure Plaintiffs' permanent residence in the United States; and (4) Plaintiffs would have steady and ongoing work opportunities in the United States with Defendant Signal.

595.     At the time each of these representations were made, Defendants knew or should have known that they were false or misleading.

596.     Defendants should have known that the false statements made by each Defendant and/or Defendants' respective agents, employees and/or representatives would induce

118

Plaintiffs to pay the exorbitant "recruitment fees," would induce Plaintiffs to leave their homes and jobs abroad, travel to the United States and work for Signal, and would induce Plaintiffs to pay the room and board fee and other fees extracted by Signal upon the workers' arrival in the United States.

597.    Each Plaintiff was entitled to, and did, rely on Defendants' representations.

598.    In reasonable reliance on the negligent representations of the Defendants and their respective agents, employees and/or representatives regarding green cards, employment opportunities and employment conditions, Plaintiffs paid large sums of money and incurred substantial debt in the guise of "recruitment fees" and other travel- and immigration-related fees. Signal knew of these payments and permitted them to be made to its agents.

599.    In reasonable reliance on the negligent representations of Defendants and their respective agents, employees and/or representatives regarding green cards, employment opportunities and employment conditions, Plaintiffs surrendered employment opportunities in India and abroad, left their homes and families behind, sold personal and real property, secured loans at usurious interest rates, traveled to the United States and worked for Signal. Further, once in the United States, Plaintiffs continued to work for Signal after receiving repeated assurances that Defendants' prior representations were in fact true.

600.    No later than the first day that Indian workers arrived at Signal, Defendants knew that Plaintiffs and their coworkers believed that Defendants had, or were intending to, apply for permanent residency on behalf of Plaintiffs. Defendants therefore had an obligation to tell Plaintiffs that this was not true. Defendants failed to do so.

601.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

119

602.    As a direct and proximate result of Defendants' negligent actions, Plaintiffs have been injured, and are entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Breach Of Contract

603.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

604.    Each Plaintiff brings this claim against all Defendants.

605.    The actions of Defendants, as set forth herein, constitute breach of contract under Mississippi law.

606.    Specifically, Defendants, individually and through their agents, employees and/or representatives, promised to assist Plaintiffs in applying for and obtaining permanent residency and immigration status for Plaintiffs in the United States no later than twenty-four months after the commencement of work and promised Plaintiffs steady and ongoing work opportunities in the United States with Defendant Signal.

607.    These promises were made in exchange for each Plaintiff's payment of fees (including recruitment, immigration application and travel fees) to Defendants and their employees, agents and/or representatives, and in exchange for each Plaintiff's agreement to work for Signal.

608.    Each Plaintiff accepted Defendants' offers and promises; each Plaintiff paid the agreed-upon fees and performed the agreed-upon work.

609.    Defendants breached their respective contracts with each Plaintiff by failing to comply with their binding promises regarding assistance in applying for and obtaining permanent residency and immigration status for Plaintiffs in the United States no later than

120

twenty-four months after the commencement of work, and steady and ongoing work opportunities in the United States with Defendant Signal.

610.    In reliance on these promises, each Plaintiff paid large sums of money and entered into substantial debts, surrendered other employment opportunities and incurred other financial losses.

611.    Defendants acted with malice and/or reckless indifference toward Plaintiffs.

612.    Defendants knew, or should have known, that their actions would cause Plaintiffs to suffer severe mental distress.

613.    As a direct result of Defendants' breach, Plaintiffs have suffered direct and consequential damages, including severe mental distress, and are entitled to recover compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs George Paily Paulose Chakkiyattil, Chandrasekhara Pillai Rajesh Chemmanappilly, Sukumar Moses Dokka, Roy Punakkattu George, Radhakrishnan Kakkathiruthi, John Abraham Kalampukatt, Thomas Baby Madakkameprathu, Anthony Marian, Jacob Mathew, Shaju Olangattu Mathew, Davis Mathai Meledan, Jeegan Joseph Cheruthalakal Michael, Gopalakrishnan Unniampathu Vettical Nair, Prakash Kuttiyil Chandrasekharan Nair, Francis Kottackal Ouseph, Purayil Arjunan Padinhare, Sudheeran Panayamthatta, Telson Joseph Pazhampilly, Sreekumar Janardhanan Pillai, Pradeep Chembil Raman, Shawkat Ali Shaikh, Arunkumar Shaw Narayan Shaw, Subash Chandra Shukla, Ajith Chellayyan Swarnamma, Shibu Thankachan, Jaison Antony Thekkumpuram, Shajan Varghese and Thomas Varghese Vattakkattu respectfully request that this Court enter an Order:

A.     Awarding damages, including actual, compensatory, statutory and punitive damages where applicable, to Plaintiffs in an amount to be determined at trial;

B.     Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs;

C.     Finding alter ego among Billy R. Wilks, J & M Associates, Inc. of Mississippi and J & M Marine & Industrial, LLC;

D.     Finding in the alternative that J & M Marine & Industrial, LLC is the successor of J & M Associates, Inc. of Mississippi;

E.     Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees;

F.     Awarding Plaintiffs their pre- and post-judgment interest, to the extent allowable; and,

G.     Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Plaintiffs George Paily Paulose Chakkiyattil, Chandrasekhara Pillai Rajesh Chemmanappilly, Sukumar Moses Dokka, Roy Punakkattu George, Radhakrishnan Kakkathiruthi, John Abraham Kalampukatt, Thomas Baby Madakkameprathu, Anthony Marian, Jacob Mathew, Shaju Olangattu Mathew, Davis Mathai Meledan, Jeegan Joseph Cheruthalakal Michael, Gopalakrishnan Unniampathu Vettical Nair, Prakash Kuttiyil Chandrasekharan Nair, Francis Kottackal Ouseph, Purayil Arjunan Padinhare, Sudheeran Panayamthatta, Telson Joseph Pazhampilly, Sreekumar Janardhanan Pillai, Pradeep Chembil Raman, Shawkat Ali Shaikh, Arunkumar Shaw Narayan Shaw, Subash Chandra Shukla, Ajith Chellayyan Swarnamma, Shibu Thankachan, Jaison Antony Thekkumpuram, Shajan Varghese and Thomas Varghese Vattakkattu hereby demand a trial on all claims so triable.

122

Dated:  August 6, 2013                    Respectfully submitted,

Robert B. McDuff, MS Bar No. 2532
Sibyl C. Byrd, MS Bar No. 100601
MCDUFF & BYRD
767 North Congress Street
Jackson, MS 39202
Telephone: (601) 969-0802
Facsimile: (601) 969-0804
rbm@mcdufflaw.com
scb@mcdufflaw.com

Eben P. Colby, *pro hac vice* to be filed
Peter Simshauser, *pro hac vice* to be filed
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
eben.colby@skadden.com
peter.simshauser@skadden.com

Counsel for All Plaintiffs